UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRIAN KENDALL,<br><br>Plaintiff,<br><br>-against-<br><br>CITY OF NEW YORK; ANNE MINOGUE, as administrator of the ESTATE OF DENNIS MINOGUE; JAMES P. ROONEY II, as executor of the ESTATE OF DETECTIVE JAMES ROONEY; *and* DETECTIVE DANIEL LYNAUGH (Tax Reg. No. 869591),<br><br>Defendants. | Civil Action No. 1:26-cv-3957<br><br>**COMPLAINT AND JURY DEMAND** |

Brian Kendall, by and through his attorneys, Emery Celli Brinckerhoff Abady Ward & Maazel LLP, for his Complaint alleges as follows:

## INTRODUCTION

1. Plaintiff Brian Kendall was a 17-year-old boy whose life was completely upended by the unscrupulous "tough-on-crime" policies and practices of the New York Police Department and the Kings County District Attorney's Office of the 1980s and 1990s. Brian went from being a typical high school teenager—playing Ms. Pac Man at the local arcade and working at the deli around the corner from his home where he lived with his loving parents and siblings—to being incarcerated for more than 16 years in New York's brutal prisons, and then deported to a foreign country, for a murder he did not commit.

2. Detectives James Rooney, Daniel Lynaugh, and Dennis Minogue of the New York Police Department ("NYPD") wrongfully arrested Brian and charged him for the shooting and murder of Raphael Reyes in Brooklyn on the basis of evidence they fabricated. Defendants Rooney, Lynaugh, and Minogue (collectively, the "Individual Defendants")—aided by Assistant

District Attorney Eric Bjorneby of the Kings County District Attorney's Office—pursued and prosecuted Brian without probable cause and despite multiple statements by witnesses, including a fellow NYPD officer, that Brian did not shoot Raphael Reyes, and another man was responsible for the murder.

3. On February 24, 1988, Raphael Reyes was working at a candy store on Cortelyou Road in the Flatbush neighborhood of Brooklyn. The candy store was known locally as the "game room" because young people congregated there to play arcade games inside the store. That night, Brian Kendall was playing arcade games with multiple friends and his girlfriend. Nicholas Ruiz, a friend of Raphael Reyes, sat by the entrance door to the game room.

4. A man entered the game room, told everyone to get out, and shot Raphael Reyes multiple times. He then turned and left the store.

5. Ruiz, Brian, and Brian's friends ran after the shooter as he walked towards Flatbush Avenue, crossed Flatbush, got into a car parked on Beverly Road, and traveled east.

6. The group chasing the shooter did not go unnoticed—multiple police officers on Flatbush Avenue radioed Central Dispatch in real-time describing the crowd noting that they were running after someone who shot a person and describing the movements of the shooter and the getaway car. Brian himself spoke to a police officer to tell them that the shooter had shot a man in the game room.

7. Nearly every witness to the shooting told the police and prosecution that the shooter was a short, heavy-set, middle-aged man—a description which plainly did not match Brian. Ruiz, the victim's friend, told police officers immediately after the shooting that the shooter he saw enter the store was a short, heavyset and middle-aged man. Brian, in contrast, was a skinny teenager who was 5'7" tall. Jessica "Odilka" DeSousa told the officers that Brian did

*not* commit the crime, and she had seen him standing outside the game room immediately after the shooting wearing a red and white jacket.

8. Defendants Minogue, Rooney, and Lynaugh were also told by the victim's cousin that an individual named Patrick Sonen (nicknamed "Fat Man" or "Fat Boy") had argued with the victim prior to the shooting, drawn a knife in the store, and come back to the store on the day of the shooting. The cousin described Sonen as a heavyset man.

9. Defendants Minogue, Rooney and Lynaugh, however, procured a drug addict named Felix Fermin, who had been arrested around the corner from the game room only weeks before the shooting and had felony drug sale charges pending in court. Fermin claimed that he saw the victim argue with the shooter and the shooter's brother in the hours before the shooting. Fermin never provided a physical description of the shooter he claimed to see and described the shooter walking away from the crime scene in the opposite direction from where Brian, Ruiz, and the NYPD officers on Flatbush Avenue had documented the shooter's movements. Fermin later gave a recorded version of his statement that was inconsistent with his initial statement, underscoring the unreliability and fabricated nature of his claim to being a witness.

10. Defendants Minogue, Rooney, and Lynaugh then procured a statement from a thirteen-year-old boy named Shawn Jones that was fabricated and clearly unreliable: Jones claimed that he had seen someone named "Brian" shoot the victim, but provided no physical description of the shooter, and said that the shooter had walked away from the crime scene in a direction opposite to what Fermin had described.

11. Using these transparently fabricated, inconsistent, and unreliable statements, Defendants Minogue, Rooney, and Lynaugh presented Fermin with an unduly suggestive photo

array to fabricate a positive identification of Brian. The Individual Defendants then arrested Brian Kendall on March 2, 1988, for the murder of Raphael Reyes.

12. After his arrest, the NYPD, Kings County District Attorney's Office ("KCDAO"), and Defendants Rooney, Minogue, and Lynaugh fabricated additional positive identifications of Brian through an unduly suggestive lineup procedure with Fermin and a photo array with Jones. Using this fabricated evidence, and ignoring exculpatory evidence, the Individual Defendants and ADA Bjorneby pursued criminal charges against Brian.

13. Brian asserted his innocence, presenting multiple witnesses to the Individual Defendants and ADA Bjorneby who were in the game room with him on the night of the shooting and confirmed that Brian did not shoot Raphael Reyes.

14. Over the course of the next year, however, the Individual Defendants withheld at least the following exculpatory evidence from Brian:

a. The 911 calls and Central Dispatch radio runs that corroborated Brian was a part of a group that chased the shooter;

b. The names of witnesses that exculpated Brian and pointed to Sonen as the perpetrator, all of whom could have served as witnesses in Brian's defense;

c. Notes of the NYPD's interview with Sonen, which would have revealed the identity of a third-party suspect;

d. That an NYPD officer told the Individual Defendants and ADA Bjorneby that he saw Brian chasing the shooter and did not think Brian was the perpetrator;

e. Defendants Minogue, Lynaugh, and Rooney had fabricated Fermin's and Jones's statements and identifications incriminating Brian;

f. Defendant Minogue had lied at the grand jury proceeding and *Wade* hearing about the identification process that led to Fermin's identification of Brian;

g. Fermin had pending criminal charges at the time that he provided his initial statement to the police;

h. Fermin had been promised and received leniency in his sentence for felony drug charges in exchange for his testimony against Brian; and

i. Fermin had been promised a letter from ADA Bjorneby recommending an early release on parole.

15. Without this favorable and impeaching material, Brian was misled to believe that the prosecution had a strong case against him, and that he would be convicted if he went to trial and sentenced to life in prison.

16. As a result of the prosecution withholding this critical *Brady* material, the court was unaware of the weaknesses of the prosecution's case, and Brian was held without bail.

17. Sixteen months after being remanded to Rikers Island and after losing his motion to suppress the false identifications against him, on July 19, 1989, Brian was pressured into pleading guilty to manslaughter in the first degree in exchange for a sentence of 8 1/2 to 25 years in prison.

18. For nearly 40 years, Brian has suffered from the consequences of wrongful conviction, unlawful imprisonment, and unjust deportation. After he was arrested at age 17, Brian never saw his mother as a free man again—she died while he was imprisoned. His beloved sister was murdered by her spouse, who then killed himself; their orphaned son Curtis—who had been very close to Brian—fell into a depression, accused Brian of abandoning him, and committed suicide. Shortly after Brian's release from prison in 2004, he was deported to Guyana—a country he had left as a child—and forced into homelessness and poverty. For over twenty years, Brian remained forcibly and unjustly separated from his family.

19. Brian spent years seeking a reinvestigation of his conviction by the CRU. After conducting a thorough investigation, on July 1, 2025, the CRU recommended that Brian's conviction be vacated because of the clear evidence of his innocence. Brian's conviction was vacated and his indictment dismissed on the same day.

20. Defendants' unlawful actions were part of a long-standing set of policies, practices, and customs that violated the constitutional rights of criminal suspects and defendants. Both the NYPD and KCDAO, as a matter of policy, manufactured evidence through the use of unduly suggestive identification procedures, unlawfully concealed exculpatory or impeachment evidence known as "*Brady*" material, and lied to or misled courts, defense attorneys, and criminal defendants in order to cover up their unlawful behavior.

21. This lawsuit seeks to compensate Brian for the prime years of his life that he lost because of his unjust and wrongful conviction and the resulting decades of wrongful incarceration and deportation.

## PARTIES

22. Plaintiff Brian Kendall is a lawful permanent resident of the United States and resides in New York.

23. Anne Minogue is the administrator of the estate of Defendant Dennis Minogue. Defendant Minogue was an Officer and later a Detective in the 70th precinct, Shield Number 11530 / Tax Reg. No. 873250, and at all times relevant hereto, was employed by the NYPD, acting in the capacity of agent, servant, and employee of the City of New York, and within the scope of his employment. He is sued in his individual and official capacities. On information and belief, Defendant Minogue died in 2018.

24. James P. Rooney II is the executor of the estate of Defendant James Rooney. Defendant Rooney was a Detective of Brooklyn South Homicide Squad, Shield Number 2912 / Tax Reg. No. 845755, and at all times relevant hereto, was employed by the NYPD, acting in the capacity of agent, servant, and employee of the City of New York, and within the scope of his employment. He is sued in his individual and official capacities. On information and belief, Defendant Rooney died in 2003.

25. Defendant Daniel Lynaugh was a Detective in the 70th precinct, Shield Number Unknown / Tax Reg. No. 869591, and at all times relevant hereto, was employed by the NYPD, acting in the capacity of agent, servant, and employee of the City of New York, and within the scope of his employment. He is sued in his individual and official capacities.

26. Defendant City of New York ("the City") is a municipality organized and existing under the laws of the State of New York and is located within the confines of the Eastern District of New York.

27. The NYPD is an agency of the City. At all times relevant hereto, the City, acting through the NYPD, was responsible for the policy, practice, supervision, implementation, and conduct of all NYPD matters and was responsible for the appointment, training, supervision, and conduct of all NYPD personnel. In addition, at all relevant times, the City was responsible for enforcing the rules of the NYPD, and for ensuring that NYPD personnel obey the laws of the United States and of the State of New York.

28. The KCDAO is an agency of the City. At all times relevant hereto, the City, acting through the KCDAO, was responsible for the policy, practice, supervision, implementation, and conduct of all KCDAO matters and was responsible for the training, supervision, and conduct of all KCDAO personnel. In addition, at all relevant times, the City was responsible for ensuring that KCDAO personnel obey the laws of the United States and of the State of New York.

**JURISDICTION AND VENUE**

29. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. This case arises under 42 U.S.C. §§ 1983 and 1988.

30. This Court has supplemental jurisdiction over claims arising under New York State law pursuant to 28 U.S.C. § 1367.

31. The acts complained of occurred in the Eastern District of New York. Venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and/or omissions giving rise to the claims occurred in the District.

32. On or about September 23, 2025, Plaintiff served upon the City timely notice of the present claims pursuant to New York General Municipal Law § 50-e.

33. A hearing pursuant to New York General Municipal Law § 50-h was held on December 23, 2025.

34. This action has been commenced within one year and 90 days of the accrual of Plaintiff's causes of action.

35. Plaintiff has duly complied with all conditions precedent to the commencement of this action.

## JURY DEMAND

36. Plaintiff demands a trial by jury in this action.

## FACTUAL ALLEGATIONS

37. In February 1988, Raphael Reyes worked at a store located at 2105 Cortelyou Road in Brooklyn, New York.

38. The store sold candy and drinks and offered several video arcade games in a back room, serving as an after-school gathering place for neighborhood youth. People in the neighborhood referred to the store as the "Game Room."

39. The entrance to the Game Room was on Cortelyou Road. To the right of the entrance door were two counters. Across from the entrance door was an adjacent room containing video arcade games.

40. On Monday, February 22, 1988, Raphael was working at the Game Room. His nephew Secundido "Tito" Salgado was also present.

41. That day, Raphael and Tito confronted a man called "Fat Man" or "Fat Boy" who was trying to sell drugs at the Game Room. The man threatened to shoot them before eventually leaving the store.

42. The next day, Tuesday, February 23, 1988, Raphael was again working at the Game Room when "Fat Man" returned.

43. Tito arrived and saw "Fat Man" going into his pocket as though he was going for a gun. Tito swung a knife at him but missed. "Fat Man" said to "leave it at that" and then left.

## I. RAPHAEL REYES IS SHOT AND KILLED ON FEBRUARY 24, 1988

44. The following day, Wednesday, February 24, 1988, Raphael was again working in the Game Room.

45. Tito arrived at the Game Room around 12:30 p.m. He saw "Fat Man" there, so left.

46. When Tito called his uncle a few hours later at 4:30 p.m., Raphael told him that "Fat Man" was still there playing games.

47. Raphael continued working at the Game Room into the evening of February 24. He was behind the counter while his friend Nicholas Ruiz sat next to him, close to the entrance door.

48. Brian Kendall was inside the Game Room playing video games together with his girlfriend Simone "Tracy" Lyken, his younger brother Sheldon Kendall, and his teenage friends Lawrence ("Larry") John, Rodwell John, and Kenneth Lowe.

49. Brian had just turned 17 years old two months before.

50. Brian was a skinny teenager—5'7" tall and 125 pounds.

51. Rodwell's older sister, Ingrid John, arrived outside the Game Room and called for him to come out and go home with her.

52. Rodwell left the Game Room, exiting onto Cortelyou Road and crossing the street to follow his sister Ingrid home.

53. As Rodwell left the Game Room, he saw a short man walking along the north side of Cortelyou Road, away from Flatbush Avenue and towards East 21st Street.

54. At approximately 7 p.m., the man entered the Game Room through the entrance door. He displayed a handgun and yelled "get out."

55. Brian, his friends inside the Game Room, and Ruiz scrambled for the doorway.

56. The shooter fired his gun several times, striking Raphael three times, with two bullets entering his head.

57. The shooter then exited the Game Room, turned left out the door, and walked along the north side of Cortelyou Road towards Flatbush Avenue.

58. Brian, Ruiz, Larry, and Kenneth all followed the shooter towards Flatbush Avenue.

59. Anthony Bobb, who had been outside the Game Room at the time of the shooting, joined the group chasing the shooter.

60. Rodwell, who was still standing across from the Game Room, also saw the shooter walk toward Flatbush Avenue and Beverly Road.

61. The shooter walked down Cortelyou Avenue to Flatbush Avenue, and then to Flatbush Avenue and Beverly Road. He began walking east on Beverly Road towards East 22nd

Street. He jumped into the passenger side of a vehicle that was parked on Beverly Road, which then fled east on Beverly Road towards Bedford Avenue.

Figure 1: Shooter's Movements After Shooting Raphael Reyes




62. NYPD Officer Davis of the 70th precinct, who was on patrol on Flatbush Avenue, saw a group of people approaching his patrol car and heard them yelling that a man had been shot down the block.

63. Two other NYPD officers, Sergeant Robert Jerak and his driver Officer Steven Greco, were engaged in a vehicle stop on Flatbush Avenue when they saw a group of people running towards Flatbush Avenue from East 21st Street. Someone in the group yelled "someone's got a gun in that store" and "a guy got shot down the street."

64. At 7:05 p.m.—approximately five minutes after the shooting—Sergeant Jerak radioed Central Dispatch and relayed that a group of individuals had been running down the block after a man with a gun: "We're at Beverly and Flatbush. Be advised, we also have a disorderly **group** here chasing somebody. Possible man with a gun. Beverly and Flatbush."

65. Sergeant Jerak radioed again about a minute later: "We're now looking for the guy with the gun. Where'd he go? Somewhere in the vicinity of East 22[nd Street] and Beverly."

66. Brian and Bobb found Sergeant Jerak and Officer Greco and told them that the man in the car had shot someone but fled.

67. Sergeant Jerak relayed that information by radioing dispatch at 7:07 p.m.: "There was a **group** apparently chasing him [the shooter that ran out]. The group is back. He's apparently gone. We're going to search the area. ***We have no description on this guy***."

68. At approximately 7:10 p.m., NYPD Officers Platt, Del Pino, and Nelson, of the 70th precinct's RIP Squad, arrived at the Game Room in response to 911 calls reporting the shooting. Officer Davis was also present. Sergeant Jerak and Officer Greco also joined the officers at the Game Room.

69. The officers found Raphael lying on his side behind the counter, bleeding profusely from his head. He died from his injuries.

70. Less than fifteen minutes after the shooting, at approximately 7:15 p.m., Officer Platt interviewed Nicholas Ruiz in the backseat of an unmarked patrol vehicle.

71. Ruiz had been inside the Game Room at the time of the shooting.

72. Ruiz told Officer Platt that about four young black males and two females had been playing video games inside the Game Room. Ruiz saw a Black male enter the Game Room, describing him to Officer Platt as **40 to 45 years old, 5'3", 155 pounds and wearing a light gray three-quarter length herringbone coat and a light gray cap**. The man displayed a gun and yelled "get out." As Ruiz fled, he heard several gunshots. Ruiz saw the shooter walking down Cortelyou Road towards Flatbush Avenue. Ruiz began to follow the shooter along with a large group of other men. The shooter walked over to Beverly Road and got into the passenger

side of a vehicle on Beverly Road between Flatbush Avenue and East 22nd Street. Ruiz described the vehicle as black, possibly four door, with white N.Y. registered license plates, and saw it travel east on Beverly Road towards Bedford Avenue.

73. Based on Ruiz's description, Officer Platt radioed Central Dispatch at 7:15 p.m.: "We got a witness in the car who says **the perp is a male Black approximately 45 years old, wearing a three-quarter length, gray herringbone coat, Central, and a gray hat**, last seen fleeing eastbound on Beverly Road and Flatbush. About **five feet tall, Central—he's kinda short**. Armed with a handgun, Central."

74. At approximately 7:40 p.m., Defendants Minogue and Lynaugh, of the 70th precinct Detective Squad, arrived at the Game Room.

75. Defendant Minogue spoke to Officer Davis, the first officer on the scene, and learned that Officer Davis had seen a crowd rushing towards him on Flatbush Avenue and yelling that a man had been shot down the block.

76. At approximately 7:45 p.m., Defendants Minogue and Lynaugh interviewed Sergeant Jerak and Officer Greco at the Game Room. Both Sergeant Jerak and Officer Greco told Defendants Minogue and Lynaugh that they had been engaged in a traffic stop on Flatbush Avenue when they saw a group of people running towards Flatbush Avenue from East 21st Street, yelling "someone's got a gun in that store" and a "guy got shot down the street."

77. At approximately 8 p.m., about an hour after the shooting, Defendant Minogue interviewed Raphael's brother William Reyes. William Reyes told Defendant Minogue that Raphael had argued with a ***short, heavy Black man*** on February 22 and February 23 over the man's attempts to sell drugs in the store. William told Defendant Minogue that he had been told by Raphael that on February 23, Raphael and Tito had to force the man to leave the store.

78. Defendants Minogue and Lynaugh returned to the 70th precinct after learning that witnesses to Raphael's shooting had been taken there.

79. At approximately 8:45 p.m.—less than two hours after the shooting—Tito was interviewed by Defendant Rooney of the Brooklyn South Homicide Squad.

80. Tito told Defendant Rooney that he had been present at the Game Room in the two days leading up to the shooting. Tito told Defendant Rooney that "Fat Man" threatened to shoot him and his uncle Raphael, and that Tito swung a knife at "Fat Man" the day before the shooting. Tito also told Defendant Rooney that he saw "Fat Man" at the Game Room several hours before the shooting, and that Raphael confirmed "Fat Man" remained at the Game Room playing video games in the late afternoon of February 24. Critically, Tito told Defendant Rooney that, after the shooting that evening, a crack dealer told Tito that Raphael was shot because of the fight Tito had with "Fat Man" the day before.

81. Thus, within hours after the shooting, the Individual Defendants[1] possessed multiple pieces of evidence pointing to a short, heavyset Black man and "Fat Man" as the shooter:

a. Raphael's brother William and nephew Tito provided information that a heavyset man called "Fat Man" had threatened and fought with Raphael and Tito in the days leading up to the shooting and was present at the Game Room on the day of the shooting;

b. Ruiz provided an eyewitness statement that he saw the shooter enter the Game Room from the outside (meaning that the shooter was not inside the Game Room playing video games at the time of the shooting);

c. Ruiz provided an eyewitness description of the shooter as a middle-aged heavy-set, short man;

---

[1] The investigation into the murder of Raphael Reyes was led by the Individual Defendants who shared information they each obtained during the investigation, and arrest and prosecution of Brian with one another. Each Individual Defendant's knowledge is imputed to the other Individual Defendants.

d. Central Dispatch radio runs confirming that a group of people had run after a man that had shot someone towards Flatbush Avenue and Beverly Road; and

e. Statements by Officer Platt, Sergeant Jerak, and Officer Greco immediately after the shooting confirming that a group of people had run past them from East 21st Street, along Cortelyou Road towards Flatbush Avenue, yelling that they were chasing a man with a gun who had just shot someone in the store on the corner.

82. No evidence possessed by the Individual Defendants pointed towards Brian—who was a 5’7” tall, skinny, 125-pound teenager inside the Game Room playing arcade games at the time of the shooting—as the shooter of Raphael Reyes.

83. The Individual Defendants, therefore, possessed evidence as early as February 24, 1988—the night of Raphael’s death—that ruled Brian out as a suspect.

84. The Individual Defendants, however, targeted Brian and pursued his arrest and subsequent criminal prosecution, apparently based on the single statement by a teenage girl that the Individual Defendants knew was not an eyewitness to the crime and that they knew was not present at the Game Room at the time of the shooting.

85. On February 24, 1988, at approximately 10 p.m., Defendants Minogue and Lynaugh, together with NYPD Detective Sanserverino, went to the home of Analise Romero, who was 14 years old at the time.

86. Analise told Defendants Minogue and Lynaugh that she was walking from Flatbush Avenue towards East 21st Street and Cortelyou Road when she saw a crowd outside the Game Room. She heard no shots and did not see anything unusual. She entered the store and saw Raphael on the floor. When she exited the Game Room, Analise saw her friend Odilka, who allegedly said “Brian did it.” Analise told the Individual Defendants that she did not know Odilka’s last name or where she lived.

87. About two hours later, around midnight on February 24, 1988, Defendant Lynaugh called Jessica “Odilka” DeSousa, who was fifteen years old, and attempted to interview her over the phone.

88. Odilka told Detective Lynaugh that she had gone to the drugstore for her mother at the time of the shooting and that she knew nothing about the incident. Odilka’s father then told the detectives that any interview of Odilka must occur in person the following day and ended the call.

## II. DEFENDANTS MANUFACTURE EVIDENCE TO SUPPORT THEIR THEORY THAT BRIAN KENDALL WAS THE SHOOTER

89. The Individual Defendants turned their focus towards pursuing “Brian.”

90. The Individual Defendants procured an individual named Felix Fermin to provide them with an account of the shooting that was entirely at odds with the radio calls, reports by NYPD officers on the scene shortly after the shooting, eyewitness statements provided by Nicholas Ruiz and Tito Salgado, and the accounts of the shooting provided by the young people that spoke to the officers on the scene at the time of the shooting.

91. Two hours after Odilka refused to speak with Defendants, the Individual Defendants found Felix Fermin.

92. At 2 a.m. on the morning of February 25, 1988, Defendant Rooney interviewed Fermin at the 70th precinct.

93. Fermin had been arrested on February 3, 1988—a few weeks before Raphael’s murder—for allegedly selling cocaine to an undercover police officer in the lobby of a building at 409 East 21st Street. That building was around the corner—only about 250 feet—from the Game Room. The criminal charges arising out of that arrest were still pending when Defendant Rooney interviewed Fermin.

94. On information and belief, the Individual Defendants were aware of Fermin's pending criminal charges and his criminal history when they interviewed him on February 25, 1988.

95. According to the DD5 form that Defendant Rooney prepared of the February 25 interview, Fermin claimed that, on the day of the shooting, Raphael had a fight with the shooter's brother and told him to leave the store. Fermin claimed that the shooter and his brother returned a short time later, and the shooter threatened to shoot someone. They again left the store, but returned shortly before 7 p.m. Fermin claimed that, at that point, Raphael told him it was "ok" for Fermin to leave the store. Fermin went around the corner, and about five minutes later, he heard shots fired. Fermin came back around the corner, stopped, and saw the shooter come out of the store with a black automatic gun in his hand. Fermin did not see the shooter's brother. Fermin provided an account of the shooter's movements: the shooter ran along Cortelyou to Flatbush Avenue, then ran back down Cortelyou and turned on East 21st Street toward Dorchester Road, and then Fermin lost sight of him. Fermin also claimed that he had seen the shooter "5 or 6 times" before.

96. Defendant Rooney knowingly and intentionally manufactured a false statement, or caused a false statement to be manufactured, from Fermin.

97. Defendant Rooney, and the other Individual Defendants, knew that Fermin's claim to have seen the shooter was fabricated because:

a. Fermin provided no physical description of the shooter or the shooter's brother and provided no names or nicknames of the shooter (or the shooter's brother), even though he claimed to have seen the shooter shortly before and shortly after the shooting and almost half a dozen times previously;

b. Fermin provided no details on where, when, why or how Fermin had seen the shooter or what the shooter looked like on those occasions;

c. No NYPD officer or other witness present at the Game Room at the time of the shooting (such as Ruiz) corroborated Fermin's claim that he was present;

d. Fermin offered an account of the shooter's actions after the shooting that was completely different from that documented by NYPD officers on the scene, radio runs, and 911 calls. Officer Platt, Sergeant Jerak, and Officer Greco all told Defendant Rooney and his colleagues on the 70th precinct Detective Squad investigating Raphael's murder that, immediately after the shooting, they saw a crowd of people run from the store on East 21st Street and Cortelyou Road towards Flatbush Avenue. That crowd reported to the police that they saw the shooter get into a car on Beverly between Flatbush Avenue and Bedford Avenue. Fermin, in contrast, claimed that the shooter first ran to Flatbush and then ran back down Cortelyou—in other words, according to Fermin, the shooter inexplicably ran back towards the Game Room where he had just shot Raphael. Fermin did not describe seeing any "group" or "crowd" of individuals chasing after the shooter; and

e. Fermin had a motive to lie because of his pending criminal charges.

98. Defendant Rooney intentionally failed to document Fermin's recent criminal history in the DD5 containing Fermin's statement so that Fermin's credibility would not be undermined.

99. Detectives Minogue and Lynaugh then brought Fermin to the KCDAO's offices to "lock in" his statement by audio recording it in the presence of the "riding ADA."

100. The NYPD and KCDAO had a policy of having a "riding ADA," who knew nothing about the case or investigation, audio tape "interviews" with witnesses in homicide cases. To ensure that the witness's statement would be consistent with the case that detectives were building against the suspect or defendant, homicide detectives would debrief the "riding ADA" shortly before turning on the audio tape to inform him or her of the facts they desired to be recorded. The witness's statement would then be recorded so he or she would be "locked in" to facts that inculpated the suspect or defendant. If, however, a witness provided exculpatory or favorable information for the suspect or defendant, detectives and "riding ADAs" were instructed and encouraged, by NYPD and KCDAO policy, not to document or record those

statements or interviews. This ensured that only inculpatory evidence was documented in the case file and that *Brady* material would not be documented and disclosed to the defense.

101. Defendants Minogue and Lynaugh made Fermin provide a five-minute recorded statement to ADA Weinman, the "riding ADA," at approximately 3:55 a.m. The statement Fermin provided differed from the one that he had given to Defendant Rooney earlier that night, in the following ways:

a. Fermin claimed in the recorded statement that the shooter and his brother left the store just before Raphael told Fermin that it was OK for Fermin to leave the Game Room;

b. Fermin claimed in the recorded statement that he saw the shooter's brother outside the Game Room when he heard the shots fired; and

c. Fermin claimed in the recorded statement that the shooter walked out of the Game Room with a gun in his hand, going down Flatbush and Cortelyou, stopped at the corner of Flatbush and Cortelyou, came down Flatbush to 21st, made a turn on 21st and disappeared. This account of the shooter's movements was physically impossible because Flatbush and East 21st Street do not cross.

102. The Individual Defendants and ADA Weinman knew that Fermin's statement and claim to have been an eyewitness was not credible because (a) Fermin's recorded statement provided to ADA Weinman was inconsistent with the statement he provided Defendant Rooney; (b) Fermin did not provide a physical description of the shooter and (c) his description of what happened was entirely inconsistent with the 911 calls, radio runs, and statements by the responding police officers and other civilian witnesses. As such, the Individual Defendants and ADA Weinman intentionally avoided asking Fermin for a physical description of the perpetrator to ensure that the suspect the police eventually settled on would not be at odds with Fermin's statement regarding the shooter's appearance.

103. On February 26, 1988, at 5 p.m., Defendants Minogue and Rooney interviewed "Fat Man." On information and belief, "Fat Man" was the street name of a man named Patrick

Sonen. Sonen claimed that he was not present at the Game Room at the time of the shooting and learned about it after it had happened. Defendant Minogue told Sonen that "word in the street had implicated him and a few of his friends in the homicide." Sonen then claimed that he was at home from approximately 6 p.m. to 8:30 p.m. on the night of the shooting.

104. The Individual Defendants knowingly and intentionally stopped pursuing Fat Man as a suspect despite Tito Salgado's reports that Fat Man had argued and threatened to shoot him and Raphael in the days leading up to the shooting; and despite Ruiz's eyewitness statement describing the gunman as a middle-aged, short, heavyset man.

105. The Individual Defendants either intentionally failed to document the conversations they described as "word in the street" in a DD5 form and in their memo books or withheld or destroyed any documentation of those conversations and interviews.

106. The Individual Defendants inexplicably accepted Sonen's uncorroborated statement that he was not present at the time of the shooting. The Individual Defendants inexplicably failed to ask Sonen for the names of his alibi witnesses or conduct any investigation into his alibi.

107. The Individual Defendants intentionally failed to include a physical description of Sonen in the DD5 form despite the "word on the street" implicating him in Raphael's shooting.

108. The Individual Defendants did not put Sonen's photo in any photo arrays to show to Tito, Ruiz, the teenagers who were eyewitnesses to the shooting, or the police officers who responded to the Game Room.

109. The Individual Defendants did not put Sonen's photo in a photo array to show Fermin, who had claimed to see the shooter.

110. Instead, the Individual Defendants continued to pursue "Brian," using as their basis the single hearsay statement of fourteen-year-old Analise Romero, who admitted she was not in the Game Room at the time of the shooting, and the fabricated and/or unreliable statement of Fermin.

111. On February 27, 1988, at 1 p.m., Defendants Minogue and Rooney interviewed Jessica "Odilka" DeSousa at her home, with her mother and sister present. Odilka told Defendants Minogue and Rooney that she left her home around 6:50 p.m. on the night of the shooting to go to the drug store on the corner of Cortelyou and Flatbush. She told the detectives that she saw Brian outside the Game Room with his girlfriend, wearing a red and white jacket with a dark baseball cap. Later, while Odilka was in the drug store, she saw Brian and a large crowd running past the drug store. After Odilka left the drug store, she saw Brian standing across the street with his brother Sheldon, Larry, and an unknown Black male. When she asked Brian what had happened, he told her that a man had been shot.

112. Odilka flatly contradicted Analise's statement that "Brian did it."

113. Far from implicating "Brian," Odilka provided additional evidence that Brian was not the shooter.

114. Odilka described Brian as wearing a red and white jacket with a dark baseball cap, which was starkly different from the physical description provided by Ruiz, who described the shooter as 40 to 45 years old, 5'3", 155 pounds, and wearing a light gray three-quarter length herringbone coat and a light gray cap.

115. Odilka confirmed that "Brian" ran with a large crowd past the drugstore on Cortelyou and Flatbush Avenue, which was consistent with the reports and radio runs of Sergeant Jerak, Officer Greco, and Officer Platt.

116. Odilka also confirmed that "Brian" and his brother stood across the Game Room after the shooting—hardly the behavior of someone who had just shot and killed a person.

117. Odilka's account of who was present with Brian at the Game Room that night—his girlfriend, his brother Sheldon, his friend Larry, and another Black male—matched the account of Ruiz, who told Defendants that several young Black males and two females were in the Game Room playing video games just before the shooting took place.

118. In keeping with the NYPD's and KCDAO's policy of only recording witness statements that inculpated a suspect or defendant, but not those that are favorable or exculpatory, Detectives Minogue and Rooney did not bring Odilka to be interviewed by the "riding ADA" at the KCDAO.

119. The Individual Defendants realized that Odilka's account exculpated "Brian" and was consistent with that of Ruiz, Sergeant Jerak, Officer Greco, Officer Platt, the teenage witnesses that ran after the shooter, the radio runs, and the 911 calls.

120. The Individual Defendants, therefore, knowingly and intentionally procured another fabricated witness statement from a juvenile in order to falsely implicate "Brian" as the shooter.

121. On February 27, 1988, about an hour and half after Defendant Minogue interviewed Odilka and was told that Brian *did not* commit the shooting, Defendant Minogue interviewed thirteen or fourteen-year-old Shawn Jones, who had purportedly walked into the 70th precinct to speak with officers. Jones claimed being inside the Game Room, hearing a gunshot, seeing Raphael fall to the floor, and seeing Brian standing behind him with an automatic gun in his "right hand." Jones claimed that he ran out of the Game Room, around the corner onto East 21st Street, and then up East 21st Street towards Beverly Road when he heard two more shots at

which point he decided to *return* to the Game Room by circling the block and coming back to Cortelyou Road. Jones claimed to see a car arrive in front of a pizzeria at 2117 Cortelyou Road (a few doors east of the Game Room), at which point Brian got into the *driver's side* of the car, and that a *gust of wind* revealed a gun protruding from Brian's waistband. Jones told the detectives that the car then drove away but did not specify where it went. Jones claimed to have seen Brian "numerous" times in the area, but provided no details on where, when, why or how he saw or knew Brian. Jones said he came to the precinct because he heard "some other guys" talking about the case.

122. The Individual Defendants knowingly and intentionally manufactured this false statement, and or caused it to be manufactured, from Jones.

123. On information and belief, the Individual Defendants supplied Jones with the name "Brian" in order to fabricate evidence implicating Brian.

124. The Individual Defendants knew that Jones's claim to have seen Brian shoot Raphael was fabricated because:

a. Jones—like Fermin—provided no physical description of "Brian" even though he claimed to have seen Brian numerous times prior to the shooting.

b. Jones provided no details on where, when, why or how he had seen or known "Brian."

c. No NYPD officer or other witness present at the Game Room at the time of the shooting (such as Ruiz) corroborated Jones's claim to have been present.

d. Jones's account of the shooting and minutes after was completely different from that documented by NYPD officers on the scene, other witnesses, radio runs, and 911 calls. Multiple witnesses described hearing three gunshots in a row, not one gunshot followed by a pause and then two more gunshots as Jones claimed.

e. Jones' account of his own movements after the shooting were transparently nonsensical and non-credible. Jones claimed he ran around an entire city block (north up East 21st Street, east across Beverly Road, south down Flatbush Avenue, and west along Cortelyou Road—a distance well over 1,300 feet) in

the time it took the shooter to travel from the Game Room at 2105 Cortelyou to a waiting getaway car parked in front of the pizzeria at 2117 Cortelyou (approximately 250 feet). The idea that Jones could have run such a long distance in mere moments, while a fleeing felon ambled along at apparently a snail's pace, was fantastical.

f. Jones' account also differed dramatically from Fermin's account of the shooter's movements. Jones claimed the shooter walked half a block down Cortelyou towards Flatbush Avenue and got in a car and fled; Fermin claimed that the shooter walked down Cortelyou towards Flatbush Avenue, turned around, came back down to Cortelyou, and then turned south to walk down East 21st Street towards Dorchester Road.

Figure 2: Shooter's Movements According to Felix Fermin




Path of Shooter According to Felix Fermin

Felix Fermin

Game Room – 2105 Cortelyou Road

Figure 3: Shooter's Movements According to Shawn Jones




125. The stark inconsistency between Jones's and Fermin's statements meant that neither Jones nor Fermin could be considered credible. Neither Jones nor Fermin, nor their statements, nor their identifications of any purported shooter could serve as the basis for probable cause to arrest Brian.

126. The Individual Defendants also knew Jones's statement was false because they never attempted to obtain from Jones the names of the "other guys" he claimed to have heard talking about the case.

127. Defendants Minogue and Rooney brought Jones to the KCDAO offices to "lock in" his statement by audio recording it in the presence of the "riding ADA."

128. Defendants Minogue and Rooney made Jones provide a four-minute recorded sworn statement to ADA Irish, the "riding ADA" on duty that day.

129. Jones provided no additional details in this recorded interview and was never asked for a physical description of "Brian."

130. The Individual Defendants and ADA Irish knew that Jones's statement and claim to have been a witness was not credible because Jones did not provide a physical description of "Brian" and because his description of what happened was entirely inconsistent with the 911 calls, radio runs, and statements by the responding police officers and other civilian witnesses. As such, the Individual Defendants and ADA Irish intentionally avoided asking Jones for a physical description of "Brian" to ensure that his description would not be at odds with the actual appearance of the "Brian" they would eventually settle on as their suspect.

131. The Individual Defendants intentionally disregarded all evidence pointing away from "Brian" as the perpetrator and pointing to Fat Man as the shooter.

## III. LACKING PROBABLE CAUSE TO ARREST HIM, DEFENDANTS FABRICATE EVIDENCE IMPLICATING BRIAN KENDALL USING AN UNDULY SUGGESTIVE PHOTO ARRAY

132. At this point, the Individual Defendants lacked probable cause to arrest Brian for the shooting of Raphael Reyes.

133. Neither Fermin nor Jones—who claimed to be present during the shooting and claimed to see the shooter—provided a physical description of the shooter that matched Brian.

134. The Individual Defendants, therefore, decided to manufacture the evidence needed to support probable cause that Brian Kendall was the shooter.

135. On the afternoon of March 1, Defendants Minogue and Rooney canvassed the area looking for Brian.

136. Though they did not find Brian, they claimed to "find" Fermin around 4 p.m. and asked him to go to the precinct.

137. At the 70th Precinct, Defendants Rooney and Minogue put together a suggestive photo array containing Brian's photo to show Fermin.

138. None of the other photos in the array looked like Brian. Brian's photo (#5) stood out from the array of six photographs as the darkest-toned image by far and the only one with a police placard clearly visible directly under his face. Further, the men in the other photos all appeared to be much lighter-skinned than Brian.




*Fig. 4: The unduly suggestive photo array*

139. Presented with the unduly suggestive photo array created by the Individual Defendants, Fermin identified Brian as the shooter.

140. The Individual Defendants used the evidence they fabricated against Brian (i.e., Fermin's identification of Brian as the shooter based on the unduly suggestive photo array they assembled) to claim they possessed probable cause to arrest Brian.

141. The Individual Defendants intentionally failed to show the photo array containing Brian's photograph to Ruiz, Tito, or Odilka, because they knew those individuals would not identify Brian as the shooter and would undermine the case the Individual Defendants were inventing against Brian.

142. The Individual Defendants also intentionally failed to show the photo array containing Brian's photograph to Sergeant Jerak, Officer Greco, or Officer Platt, who were the first officers on the scene and had seen the crowd of teenagers chasing the shooter, because they knew those individuals would identify Brian as a member of that group and would therefore undermine the case the Individual Defendants were inventing against Brian.

## IV. DESPITE THE INDIVIDUAL DEFENDANTS' KNOWLEDGE THAT HE WAS NOT THE SHOOTER, DEFENDANTS FALSELY ARREST BRIAN KENDALL

143. The morning after Fermin's manufactured identification of Brian, on March 2, 1988, Defendants Minogue and Rooney went to the Kendall family apartment.

144. Brian and his friend Valerie Stuart were inside the apartment at the time. Brian's parents were not home.

145. Brian opened the door when Defendants Minogue and Rooney knocked. Defendants Minogue and Rooney falsely told Brian that they wanted him to come to the precinct to answer questions about a pending youthful offender case.

146. Brian agreed to go to the precinct based on this false representation. To his surprise, Defendants Minogue and Rooney entered his home and handcuffed him.

147. Terrified, Brian asked why he was being handcuffed. Detectives Minogue and Rooney again lied and told Brian that the handcuffing was "routine."

148. Even though the Individual Defendants arrested Brian, they did not have probable cause to do so, nor did they have an arrest warrant to execute the arrest inside his home.

149. The Individual Defendants used a ruse to get Brian, a minor, to agree to leave his home and come with them to the precinct where they could interrogate him and force him to undergo a lineup.

150. On the way to the precinct in a patrol car, one of the Individual Defendants asked Brian if he knew why he was being locked up. Brian said he was not being locked up since they were just asking questions about the youthful offender case.

151. Defendants Minogue and Rooney laughed and told Brian he was being locked up for Raphael Reyes's murder. Brian immediately protested his innocence—that he was in the Game Room but he had not committed the murder—and continued to protest all the way to the precinct.

152. At the precinct, Defendants Rooney and Minogue put Brian in a room alone.

153. Brian asked to call his mother or his lawyer, but the officers laughed and told him he "watched too much TV."

154. The Individual Defendants interrogated Brian outside the presence of his parents and his attorney about the shooting of Raphael Reyes. They berated him and questioned him repeatedly about what he was doing on the day of the shooting. They showed Brian pictures of dead bodies, body parts, and other gruesome images.

155. The Individual Defendants' interrogation of Brian, a minor, outside the presence of his parents, without permitting him to contact his mother or his lawyer, and without obtaining a waiver of his *Miranda* rights, was a pattern and practice of the NYPD at that time. So too was the Individual Defendants' use of coercive tactics to attempt to extract a confession from a teenager like Brian.

156. Brian told the police he did not know the people depicted in the gruesome photographs and did not shoot Raphael Reyes. Brian told the Individual Defendants that he had been playing video games at the Game Room at the time of the shooting and provided the Individual Defendants with the names of his friends who could corroborate that.

157. The Individual Defendants intentionally did not create written documentation of the names of the witnesses that Brian provided, nor did they seek to interview them at that time, because the Individual Defendants knew that those witnesses would exculpate Brian.

158. Though Raphael Reyes had been shot with a gun, the Individual Defendants also never sought to search Brian's home or school for the murder weapon. Because they knew Brian was innocent, the Individual Defendants knew such searches would be fruitless.

159. Shortly after Brian's arrest on March 2, 1988, at 1 p.m., Defendant Minogue interviewed teenager Valerie Stuart.

160. Valerie had been present at Brian's home that morning when the Individual Defendants arrested him.

161. Valerie told Defendant Minogue that, while she was not present at the Game Room at the time of the shooting, Larry had called her at approximately 10:30 p.m. to tell her that he, Brian, Sheldon, and a few others were in the Game Room earlier that night. Larry said a stranger with a gun entered the store and shot Raphael.

162. Despite this statement from Valerie—which was entirely consistent with the statement of eyewitness Ruiz that a group of young people were playing arcade games inside the Game Room when the shooter entered from the outside and shot Raphael—the Individual Defendants continued to hold Brian in custody and to fabricate evidence to falsely implicate Brian as the shooter.

163. Defendants Minogue and Rooney, together with their supervisor Lieutenant Azzanari of the 70th precinct Detective Squad, forced Brian to participate in a lineup at the precinct at approximately 3 p.m. that afternoon.

164. At the lineup, Fermin stated that he recognized Brian from "East 21st Street and Cortelyou" and claimed that Brian was the "guy [he] saw leave the store with an automatic in his hand" after the shooting.

165. The lineup was unduly suggestive: none of the other fillers in the line-up looked like Brian.

166. Fermin could not have recognized Brian from East 21st Street and Cortelyou or seen Brian with an automatic in his hand after the shooting—because Brian was not the shooter, and Fermin was not present.

167. Rather, Fermin recognized Brian from the unduly suggestive photo array procedure that Defendants Minogue and Rooney conducted.

168. No lawyer or adult was present on Brian's behalf during the lineup procedure.

169. The Individual Defendants' use of unduly suggestive photo arrays and lineups to manufacture false identifications of suspects was a pattern and practice of the NYPD at the time.

170. Jones did not view the lineup and did not identify Brian from the lineup.

171. The Individual Defendants formally placed Brian under arrest after Fermin identified him in the lineup.

172. When the Individual Defendants placed Brian under arrest, they knew that the arrest was not supported by probable cause because they knew:

a. Fermin's identifications of Brian had been falsely manufactured by the Individual Defendants through use of an unduly suggestive photo array and unduly suggestive lineup;

b. Fermin's statement was fabricated and manufactured by the Individual Defendants;

c. Fermin's statement to Defendant Rooney was inconsistent with his recorded statement to ADA Weinman;

d. Jones's statement was fabricated and manufactured by the Individual Defendants; and

e. All credible evidence—the Central Dispatch radio runs, the statements of the NYPD officers that responded to the crime scene, the statement of Nicholas Ruiz, the statements of Tito Salgado and William Reyes, the statement of Jessica "Odilka" DeSousa, and the statement of Valerie Stuart—made clear that Brian was not the shooter and instead pointed to a heavyset Black man being the shooter.

173. Several hours after his arrest, Brian's mother called the police to ask if they knew where her son was. Defendant Minogue told her that they had arrested her child for committing a murder.

174. Brian spent the night in jail and then arraigned in court the following morning for the murder of Raphael Reyes.

175. At the arraignment, Brian was denied bail and sent to Rikers Island, where he would remain for the next year and a half until his conviction in July 1989.

176. The Individual Defendants forwarded the evidence they had manufactured against Brian to the KCDAO, and the KCDAO relied on that false evidence to initiate criminal proceedings against Brian.

177. Defendant Rooney intentionally told and misrepresented to prosecutors at the KCDAO that Fermin and Jones were the only eyewitnesses—so that other *actual* witnesses, such as Ruiz, who would have exculpated Brian, would not be shown the lineup.

178. Defendant Minogue intentionally told and misrepresented to prosecutors at the KCDAO that Ruiz had seen Brian display a handgun inside the store, when Ruiz never identified Brian as the gunman and had described the shooter as a short, heavy set, middle-aged Black man.

## V. DEFENDANTS KNOWINGLY AND INTENTIONALLY INITIATE AND PURSUE CRIMINAL PROCEEDINGS AGAINST BRIAN KENDALL WITHOUT PROBABLE CAUSE AND BASED UPON FABRICATED EVIDENCE

179. Assistant District Attorney ("ADA") Eric Bjorneby, employed by the KCDAO and Defendant City of New York, was the prosecutor that led the criminal prosecution of Brian.

180. On March 7, 1988, ADA Bjorneby commenced grand jury proceedings against Brian. In initiating and maintaining grand jury proceedings, the Individual Defendants and ADA Bjorneby lacked probable cause to do so and willfully and intentionally withheld from the grand jury:

a. The statements of the witnesses interviewed by the Individuals Defendants that identified Raphael Reyes's shooter as a heavy-set Black man;

b. That the witnesses' accounts implicated Patrick Sonen;

c. That 911 calls and police officers at the scene corroborated the account provided by Brian and the other witnesses;

d. That the Individual Defendants had manufactured, or caused to be manufactured, the statements of Felix Fermin and Shawn Jones; and

e. Evidence that seriously undermined the accounts of Fermin and Jones.

181. ADA Bjorneby knew or should have known that Fermin and Jones, and the statements they provided, were not credible or reliable witnesses because neither had provided a physical description of the individual they claimed to be the shooter, as well as the other reasons outlined in paragraph 172, *supra*.

182. On March 7, 1988, Defendant Minogue brought Felix Fermin and Shawn Jones with him to testify before the grand jury.

183. Before Jones testified, Defendant Minogue presented him with the same suggestive photo array containing Brian's photograph that had been shown to Fermin.

184. Presented with the unduly suggestive photo array created by Defendant Minogue, Jones identified Brian's photograph as "Brian," the "guy in the store that shot the guy."

185. ADA Bjorneby and the Individual Defendants knowingly and intentionally presented to the grand jury the fabricated testimony of Fermin and Jones that was facially noncredible; internally inconsistent; inconsistent with each other; and inconsistent with the statements exculpating Brian of Nicholas Ruiz, William Reyes, Tito Salgado, the police officers that responded to the scene, the 911 calls, the radio runs, and Odilka.

186. On information and belief, ADA Bjorneby and the Individual Defendants knowingly and intentionally withheld from the grand jury the fact that Fermin had open criminal drug charges and facing jail time, which gave him a motive to implicate someone in Raphael's death in exchange for favorable treatment in his criminal cases.

187. On information and belief, ADA Bjorneby and the Individual Defendants knowingly and intentionally withheld from the grand jury information that they promised Fermin favorable treatment on his pending criminal charges in exchange for his testimony against Brian.

188. After grand jury proceedings began, Brian's criminal defense attorney, Harold Dusenberry, organized a series of meetings between the KCDAO, the NYPD, and the teenagers who had been in or around the Game Room at the time of the shooting to provide them with additional evidence that Brian did not shoot Raphael Reyes.

189. **Anthony Bobb:** On March 8, 1988, ADA Bjorneby and Defendant Minogue, together with defense counsel Harold Dusenberry, interviewed Anthony Bobb, whose nickname was "Moon." Bobb told Defendant Minogue and ADA Bjorneby that he was outside the Game Room on the night of the shooting when he saw Brian run out of the Game Room saying that someone who was running up the block just shot someone. Bobb looked up the block and saw a

person with a three-quarter-length brown jacket and hood walking toward Flatbush Avenue. Bobb started running after the man. When Bobb got to the corner of Flatbush Avenue and Cortelyou Avenue, he saw the man running toward Beverly Road. Bobb and Brian flagged down a NYPD patrol vehicle and gave them the information and continued chasing the man. Bobb said that he believed the man entered a car located between Flatbush Avenue and East 22nd Street.

190. ADA Bjorneby and the Individual Defendants knew that Bobb's statement that a group of boys chased the shooter towards Flatbush Avenue and then saw the man head to Beverly Road, where he got into a car, was corroborated by Ruiz, the NYPD officers on the scene after the shooting, the initial NYPD radio dispatches confirming the presence of a **group** running past the officers, and Odilka.

191. **Kenneth Lowe:** On March 8, 1988, ADA Bjorneby and Defendant Minogue, together with Dusenberry, interviewed Kenneth Lowe. Kenneth told Defendant Minogue and ADA Bjorneby that he was inside the Game Room at the time of the shooting. He saw a man enter the store, heard a shot, and then ran out of the Game Room across the street. He then saw a short, fat man (about 5' in height, 185 lbs) in his 50s exit the Game Room and walk towards Flatbush Avenue. Together with Brian, Bobb, and Larry John, Kenneth chased the man down Flatbush Avenue towards Beverly Road. Kenneth expressly told ADA Bjorneby and Defendant Minogue—which Defendant Minogue even recorded in his DD5—"Brian didn't do it."

192. ADA Bjorneby and the Individual Defendants knew that Kenneth's statement was corroborated by Ruiz, the NYPD officers on the scene after the shooting, the NYPD radio dispatches confirming the presence of a **group** running past the officers, and Odilka.

193. By the time ADA Bjorneby and the Individual Defendants interviewed Kenneth, they also knew that Bobb corroborated Kenneth's statement.

194. **Ingrid John:** On March 8, 1988, ADA Bjorneby and Defendant Minogue interviewed Ingrid John, the older sister of Rodwell and Larry John. Ingrid told them that, on the night of the shooting, she was at the corner of Flatbush Avenue and Cortelyou Road in front of the drugstore when she saw a bunch of people running across the street.

195. ADA Bjorneby and the Individual Defendants knew that Ingrid's statement that a group of people were running across the street, in the vicinity of Flatbush Avenue and Cortelyou Road, was corroborated by Ruiz, the NYPD officers on the scene after the shooting, the initial NYPD radio dispatches confirming the presence of a **group** running past the officers, and Odilka.

196. By the time ADA Bjorneby and the Individual Defendants interviewed Ingrid, they also knew that Bobb and Kenneth corroborated Ingrid's statement.

197. **Lawrence John:** On March 8, 1988, ADA Bjorneby and Defendant Minogue interviewed Lawrence John. Larry stated that he was inside the Game Room playing video games, as was Brian, at the time of the shooting. He saw a man enter the Game Room from the outside and said, "Excuse me." The man was short, fat, and middle-aged. Larry heard gunshots, turned, and saw a small black gun in the man's right hand. After the shooting, the man told everyone to get out. Larry saw the shooter "making a right on Flatbush," while Larry and Brian chased after him. During the chase, Larry saw Bobb talking to police officers. Larry ran to Flatbush Avenue and Beverly Road and saw the man enter an automobile on the right-hand side of Beverly Road, approximately two car lengths off of Flatbush Avenue.

198. ADA Bjorneby and the Individual Defendants knew that Larry's statement—describing the shooter as a short, fat, middle-aged man, who entered the Game Room from the outside and walked towards Flatbush Avenue and then over to Beverly Road where he got into a

car after the shooting—was corroborated by Ruiz, the NYPD officers on the scene after the shooting, the initial NYPD radio dispatches confirming the presence of a **group** running past the officers, and Odilka.

199. By the time ADA Bjorneby and the Individual Defendants interviewed Larry at 5:30 p.m. on March 18, 1988, they also knew that Bobb, Kenneth, and Ingrid also corroborated Larry's statement.

200. **Simone "Tracy" Lyken:** On March 8, 1988, ADA Bjorneby and Defendant Minogue also interviewed Simone ("Tracy") Lyken. Tracy stated that she was inside the Game Room with Brian, her boyfriend, at the time of the shooting. She saw a man wearing a brown coat enter the store, heard a shot, and then Brian pulled her out of the store. She heard two more shots after they were out of the store. Brian told Tracy to go to his nearby apartment, where she would be safe, and she did.

201. ADA Bjorneby and the Individual Defendants were aware that Tracy's description of the shooter as someone who entered the Game Room from the outside was corroborated by Ruiz, Bobb, and Larry.

202. Every witness interviewed by ADA Bjorneby and the Individual Defendants on March 8, 1988, exculpated Brian.

203. ADA Bjorneby and the Individual Defendants, however, knowingly and intentionally continued criminal proceedings against Brian for the homicide of Raphael Reyes.

204. **Sheldon Kendall:** On March 15, 1988, an investigator with the KCDAO interviewed Brian's brother, Sheldon Kendall. Sheldon stated that he was inside the Game Room at the time of the shooting, together with his older brother Brian, Tracy, and Orlon Phillips. Sheldon was wearing headphones. After the first shot, he said he removed the headphones and

saw a husky Black male wearing a brown jacket fire two more shots. The gunman told everyone to get out, and they fled. Sheldon also corroborated Tracy's statement that Brian sent his girlfriend home, and then chased the shooter with Sheldon, Bobb, and Larry. The shooter ran down Beverly Road until he entered a getaway car.

205. ADA Bjorneby knew that Sheldon's statement was corroborated by Ruiz, the NYPD officers on the scene after the shooting, the initial NYPD radio dispatches confirming the presence of a **group** running past the officers, and Odilka.

206. By March 15, 1988, when Sheldon Kendall was interviewed by the KCDAO investigator, ADA Bjorneby also knew that Bobb, Kenneth, Ingrid, Larry, and Stacy corroborated Sheldon's statement.

207. **Orlon Phillips:** On March 16, an investigator with the KCDAO interviewed Orlon Phillips. Orlon stated that he was in the game room with Brian, Larry, Tracy, Sheldon, and "Rondell." Orlon was playing a video game when he heard two shots, turned and saw a man—not Brian—holding a gun fire a third shot. Together with a group of individuals from the Game Room, he chased the shooter.

208. ADA Bjorneby knew that Orlon's statement was corroborated by Ruiz, the NYPD officers on the scene after the shooting, the initial NYPD radio dispatches confirming the presence of a **group** running past the officers, and Odilka.

209. By March 16, 1988, when Orlon was interviewed by the KCDAO investigator, ADA Bjorneby also knew that Bobb, Kenneth, Ingrid, Larry, Stacy, and Sheldon corroborated Orlon's statement.

210. Knowing that Nicholas Ruiz, the NYPD officers on the scene after the shooting, the NYPD radio dispatches, Anthony Bobb, Kenneth Lowe, Ingrid John, Lawrence John, Simone

Lyken, Sheldon Kendall, and Orlon Phillips all contradicted Fermin and Jones—and that Fermin and Jones contradicted each other and themselves—any reasonable prosecutor or police detective would have had serious doubts that Brian shot Raphael Reyes, and would have discontinued the prosecution against him. Instead, with utter disregard for the truth and Brian's constitutional rights, ADA Bjorneby and the Individual Defendants continued the prosecution.

211. On March 24, 1988, the grand jury indicted Brian for Murder in the Second Degree and Criminal Possession of a Weapon in the Second Degree.

212. At some point after Brian's arrest and before his conviction, Officer Platt told the Individual Defendants that Brian was not the shooter because he one of the teenagers who pursued the shooter and flagged down the officers after the shooting occurred. In other words, Officer Platt told the Individual Defendants that they arrested and charged the wrong person.

213. The Individual Defendants failed to document or disclose Officer Platt's exculpatory statement to the KCDAO and/or the KCDAO failed to document and disclose Officer Platt's exculpatory statement to Brian and his attorney, as required by *Brady*.

## VI. KCDAO CONCEALS MATERIAL EXCULPATORY EVIDENCE

214. On May 17, 1988, Brian's defense counsel, Harold Dusenberry, moved for discovery and inspection, and a bill of particulars, for the names of all eyewitnesses to the shooting that were known to the NYPD or the KCDAO and that caused Brian's arrest.

215. Dusenberry also moved to suppress Fermin's identification based on the suggestive nature of the photo array and requested a *Wade* hearing.

216. ADA Bjorneby opposed Dusenberry's motion. He argued that a *Wade* hearing was unnecessary because Fermin and Jones (who he did not refer to by name) were credible,

even though ADA Bjorneby knew they were not credible for all the reasons set forth in paragraphs 97 and 124, *supra*.

217. At the June 30, 1988, calendar call, Dusenberry requested the full names of the witnesses that had provided statements to the police that Raphael Reyes had been involved with a verbal altercation with "Fat Patrick" prior to the shooting. Dusenberry asserted that this information was *Brady* material.

218. ADA Bjorneby never provided the full names of Tito Salgado or William Reyes to Brian or his defense counsel. Hamstrung by ADA Bjorneby's failure to turn over this critical information, Dusenberry was unable to find and speak to Tito and William.

219. On information and belief, ADA Bjorneby spoke to Officer Platt prior to the *Wade* hearing, and Officer Platt told ADA Bjorneby that he did not believe Brian was the shooter because he was one of the teenagers who chased the perpetrator and flagged down the officers after the shooting occurred.

220. ADA Bjorneby knowingly and intentionally failed to disclose this exculpatory information to Brian and his attorney as required by *Brady*.

221. Officer Platt's statement to ADA Bjorneby further undermined the prosecution's probable cause to continue prosecuting Brian for the murder of Raphael Reyes. Nonetheless, ADA Bjorneby and the KCDAO continued prosecuting Brian.

222. ADA Bjorneby also did not disclose the 911 calls and radio runs from the NYPD officers to Central Dispatch immediately after the shooting that documented the presence of a crowd or group of people running after the shooter in a direction opposite than what Fermin and Jones described to the NYPD and KCDAO.

223. ADA Bjorneby never provided a copy of the DD5 of the police interview with Patrick Sonen to Brian or his attorney.

224. At an August 30, 1988, hearing, Dusenberry noted that the DD5s he received from ADA Bjorneby had *Brady* material redacted: (1) the name of the witness that was standing next to Raphael at the time of the shooting and described the shooter as 40- to 45-years old (Nicholas Ruiz); (2) the name of the witness that spoke with Officer Platt (Nicholas Ruiz); (3) the name of the witness that spoke to Officer Minogue and described the shooter as "heavy" (Tito Salgado); (4) the name of the witness that spoke with Detective Rooney and described an argument with the shooter (Tito Salgado); (5) the name of the witness that spoke with Detective Minogue and told him that she had seen Brian Kendall minutes after the shooting and that he was wearing a red and white jacket, which was different from witnesses' descriptions of the shooter's clothing (Jessica "Odilka" DeSousa).

225. The judge agreed that Brian was entitled to this information and ordered ADA Bjorneby to disclose it.

226. ADA Bjorneby never disclosed this information to Brian or attorney.

227. ADA Bjorneby also redacted the names of Analise Romero, Felix Fermin, and Shawn Jones from the DD5s that were turned over to Dusenberry. ADA Bjorneby withheld their identities from Brian and his attorney.

228. By failing to provide the names of these witnesses, ADA Bjorneby willfully and intentionally prevented Dusenberry from interviewing those witnesses, investigating their criminal history, credibility or bias, obtaining exculpatory evidence, using the exculpatory and impeachment evidence to advise his client about his chances at trial, or presenting that exculpatory and impeachment evidence in Brian's defense at trial.

229. ADA Bjorneby and the Individual Defendants knowingly and intentionally avoided interviewing eyewitness Ruiz before trial or subpoenaing him to testify at trial because they knew his testimony would exculpate Brian.

230. ADA Bjorneby and the Individual Defendants received a letter from Ruiz stating that he checked himself into a hospital and providing the name of the hospital where he was located. ADA Bjorneby knowingly and intentionally withheld Ruiz's letter and his location from Brian and his lawyer.

231. By withholding Ruiz's letter and his location, ADA Bjorneby knowingly and intentionally prevented Brian's attorney from interviewing Ruiz, obtaining exculpatory information, using the exculpatory information to advise his client about his chances at trial, or presenting an exculpatory witness in Brian's defense at trial.

232. ADA Bjorneby knowingly and intentionally withheld from Brian and his attorney information that Fermin had been arrested on February 3, 1988, for selling crack cocaine and that he was facing charges and jail time for the sale and possession of a controlled substance.

233. Fermin resolved those charges on March 6, 1989, by pleading guilty to third-degree criminal sale of a controlled substance in exchange for a promised sentence of one to three years imprisonment.

234. The KCDAO's original plea offer to Fermin included a term of imprisonment of 2 to 6 years. ADA Bjorneby and the KCDAO offered Fermin a lesser term of imprisonment of 1 to 3 years in exchange for his testimony against Brian.

235. On April 10, 1989, Fermin was sentenced as promised.

236. ADA Bjorneby knowingly and intentionally withheld from Brian and his attorney that he and the KCDAO had offered Fermin a more lenient sentence as part of a plea deal in exchange for Fermin's testimony against Brian.

237. ADA Bjorneby knowingly and intentionally withheld from Brian and his attorney that Fermin had pled guilty to lesser charges and a lower sentence on March 6, 1989.

238. ADA Bjorneby also knowingly and intentionally withheld from Brian and his attorney that Fermin agreed to provide testimony against Brian because, prior to Brian's plea, ADA Bjorneby had promised to provide Fermin a letter to the parole board supporting his early release.

239. ADA Bjorneby sent a letter to Fermin's correctional counselor, fulfilling his promise to Fermin. On information and belief, ADA Bjorneby's letter resulted in Fermin being paroled at the earliest eligible date.

240. ADA Bjorneby knew that Shawn Jones had been uncooperative in the months leading up to Brian's trial: Jones had ignored multiple requests from ADA Bjorneby to call or contact him. When Jones was personally served with a subpoena on July 12, 1989, with a return date of July 13 or 14, 1989, on information and belief, Jones did not appear in court. Jones's behavior illustrated his unreliability as a witness.

241. ADA Bjorneby knew that Jones could not serve as the basis for probable cause to continue prosecuting Brian, yet he failed to inform Brian and his attorney.

242. All of the aforementioned information was *Brady* material that ADA Bjorneby and the KCDAO were constitutionally obligated to disclose to Brian and his attorney.

243. ADA Bjorneby and the KCDAO did not produce any of it.

## VII. BECAUSE OF THIS FAILURE TO DISCLOSE, THE PROSECUTION UNCONSTITUTIONALLY PRESSURED BRIAN KENDALL INTO PLEADING GUILTY TO A MURDER HE DID NOT COMMIT

244. ADA Bjorneby and the KCDAO were obligated to produce any and all *Brady* material prior to July 19, 1989, the date for hearings and trial. They did not.

245. On July 19, 1989, the Court held a *Wade* hearing concerning the defense motions to suppress the photo array and lineup identifications as unconstitutional.

246. At the *Wade* hearing, Defendant Minogue testified that Fermin and Jones provided statements claiming that Brian had been the shooter. Defendant Minogue testified that Fermin had identified Brian from a photo array on March 1, 1988, and had identified Brian in a lineup on March 2, 1988.

247. Defendant Minogue lied at the *Wade* hearing.

248. Defendant Minogue falsely testified that Fermin had provided a physical description of the shooter before Defendant Minogue showed Fermin the photo array that included Brian's photograph.

249. In fact, Fermin never provided a physical description of the shooter, and no physical description was reflected in the DD5 recording Fermin's statement or in the recorded interview of Fermin taken by ADA Weinman.

250. The Court denied the defense motions to suppress the identifications.

251. For 16 months, Brian maintained his innocence. He refused all plea offers made by the KCDAO, including one for seven to twenty-one years in prison.

252. During this time, ADA Bjorneby and the KCDAO intervened in Fermin's pending criminal case, agreeing to a reduced sentence and promising to support his early release on parole in exchange for his testimony against Brian. This was not disclosed to Brian or his attorney.

253. ADA Bjorneby and the KCDAO never disclosed to Brian and his attorney that its only other witness, fourteen-year-old Shawn Jones was unreliable.

254. ADA Bjorneby and the KCDAO never disclosed the names of exculpatory witnesses Tito Salgado, William Reyes, and Jessica "Odilka" DeSousa.

255. ADA Bjorneby and the KCDAO never disclosed the name and location of exculpatory witness Nicholas Ruiz.

256. The Individual Defendants, ADA Bjorneby and the KCDAO never disclosed that Officer Platt exculpated Brian.

257. ADA Bjorneby and the KCDAO never disclosed the name, identity, and DD5 interview of Patrick Sonen.

258. As a result of this knowing and intentional concealment of exculpatory and impeachment evidence, Brian and his attorney were unable to find and speak to these witnesses, to call them to testify at Brian's trial, or to present a third-party culpability defense that "Fat Man," "Fat Patrick" or Patrick Sonen committed Raphael Reyes's murder.

259. As a result of the Individual Defendants', ADA Bjorneby's and the KCDAO's knowing and intentional concealment of exculpatory and impeachment evidence, Dusenberry could not properly advise his client about his chances at trial.

260. As a result of ADA Bjorneby's deliberate concealment of *Brady* material, Brian and Dusenberry believed that the prosecution's case was much stronger than it actually was.

261. ADA Bjorneby offered Brian a plea to first-degree manslaughter in full satisfaction of the indictment and 8 1/2 to 25 years in prison after the court denied Brian's motion to suppress the fabricated identification evidence. If Brian was convicted after trial, he would likely have been sentenced to 25 years to life.

262. ADA Bjorneby and the KCDAO were constitutionally required to disclose the aforementioned *Brady* material to Brian and his attorney before any guilty plea could be entered. *See United States v. Bagley*, 473 U.S. 667, 682 (1985); *Miller v. Angliker*, 848 F.2d 1312, 1320 (2d Cir. 1988).

263. By failing to do so, ADA Bjorneby and the KCDAO intentionally misrepresented the strength of their case and intentionally misled Brian and his attorney into believing they had a poor chance of winning the trial in order to unduly pressure Brian to plead guilty.

264. Brian believed he had no choice but to accept the manslaughter plea to avoid a life sentence.

265. The allocution was *pro forma* and not under oath. Brian merely said "yes" several times to the Court and the prosecutor's descriptions of the murder, without volunteering any details about the shooting he allegedly committed.

266. After taking the plea, Brian could not stop crying in his interview with the probation officer, begging to take the plea back.

267. As a result of ADA Bjorneby's and the KCDAO's deliberate concealment of *Brady* material, Brian's guilty plea was not knowing, voluntary or intelligent.

## VIII. BRIAN KENDALL'S WRONGFUL ARREST AND CONVICTION DESTROYED HIS LIFE AND THAT OF HIS FAMILY

268. Brian ultimately served ***more than 16 years*** in prison before he was released.

269. During his incarceration, he was assaulted, robbed, and harassed by guards and other incarcerated individuals. He sustained physical injuries from this violence and received inadequate medical treatment.

270. Brian suffered severe emotional and mental anguish and pain as a result of being punished for crimes he did not commit, harassment by correction officers, and dehumanizing treatment by prison staff.

271. He suffered from lack of privacy, humiliation, harsh prison conditions, and feared he would die in prison.

272. He was denied adequate treatment for his injuries while incarcerated and continues to suffer mental and emotional anguish to this day.

273. Brian has been diagnosed with post-traumatic stress disorder as a result of the brutality of his decades of incarceration.

274. Brian was also denied the opportunity to pursue normal relationships with, and to enjoy the companionship of, his family members and friends.

275. While incarcerated, Brian received a call that his sister Roxanne had died. She was murdered by her husband, who then killed himself. Brian's nephew, Curtis, with whom he was very close, found their bodies when he got home from school.

276. Brian was only able to attend his sister's funeral in shackles.

277. Brian felt responsible for his sister's death because he thought, if he was not in prison, perhaps he could have protected his sister. Brian carried even more guilt that he could not protect Curtis or look after him after his parents' deaths.

278. While incarcerated, Brian's mother—his rock and life source—died of cancer. To this day, Brian believes his mother's illness was due to the stress, anxiety, and anguish of his wrongful conviction and subsequent incarceration. Brian found it harder to speak to his mother by phone because he could hear her voice change as she became more ill with cancer, further limiting his ability to connect with her.

279. Brian cried so hard upon hearing the news that he asked to be put into solitary confinement so that he could grieve privately.

280. Brian attended his mother's funeral in shackles.

281. After serving more than 16 years in prison, in December 2004, Brian was transferred from New York State custody to the custody of federal immigration authorities, detained for an additional month, and then deported to Guyana.

282. Brian did not know that his conviction could lead to his deportation. He had moved to the United States from Guyana with his family when he was 11 years old as a lawful permanent resident.

283. Brian arrived in Guyana with no family, no money, and no place to live. For months, he had to sleep on the couches of his sisters' friends—people he had never met.

284. Brian was alone in a foreign country far away from his family. He was rarely able to speak to his family because international calls were too expensive. And, because the trip to Guyana was too expensive, his family was unable to visit him.

285. For the first year after being deported, Brian struggled to make money and find employment. He made pennies selling nuts on the street and survived only on the money his family was able to send him.

286. While Brian was abroad, his father died of Parkinson's disease. Brian's father had often told Brian that he had failed Brian because he did not have the resources or knowledge to protect him during his arrest.

287. Brian could not attend his father's funeral because his deportation—as a result of his wrongful conviction—prevented him from returning to the United States. Brian blamed

himself for not being able to attend the funeral and for not having the chance to live with his parents after he was arrested at age 17.

288. His deportation also meant that Brian could not look after his nephew Curtis. After Curtis's parents died, Brian's mother took him in. After her death, no one was able to look after Curtis. Curtis looked up to Brian and even called him the most important person in his life after Curtis's parents died.

289. Prior to being deported, Brian did not have an opportunity to explain to Curtis that he was being sent to Guyana involuntarily. As a result, Curtis did not understand why his uncle did not return home after his release from prison. Sadly, Curtis believed that Brian had abandoned him. Shortly thereafter, Curtis died by suicide. Brian was devastated. Brian felt that Curtis died because Brian couldn't be there for him and teach him about life.

290. Brian could not attend Curtis's funeral because his deportation—as a result of his wrongful conviction—prevented him from returning to the United States.

291. Brian was also denied years of gainful employment and income, as well as the opportunity to fulfill his dream of serving in the United States military.

292. Brian has been publicly shamed, disgraced, ridiculed, and humiliated. He was branded a murderer. Nothing can undo the reputational damage he sustained.

293. Despite the unjust deprivation of his liberty and deportation, Brian tried to make the best of a horrible situation as best he could. He obtained his GED, trained to work as an electrician, and taught anti-violence programs.

## IX. THIRTY-SEVEN YEARS AFTER HIS WRONGFUL CONVICTION, AND AFTER SIXTEEN YEARS OF BEING DEPRIVED OF HIS FREEDOM, BRIAN KENDALL IS EXONERATED

294. Brian never gave up fighting to clear his name.

295. Brian asked the Kings County District Attorney's Conviction Review Unit ("CRU") to review his case after he heard that the CRU had exonerated one of his friends.

296. In 2024, CRU began to reinvestigate Brian's case. Over the next year, CRU spoke with numerous witnesses and reviewed thousands of pages of transcripts, police reports, and other files.

297. CRU concluded, based on its investigation, that Brian was not the person who shot Raphael Reyes.

298. CRU interviewed Officer Platt, the RIP officer that responded to the crime scene on February 24, 1988. Officer Platt confirmed that he had seen Brian outside the Game Room after the shooting. Officer Platt also told CRU that after Brian's arrest and before his conviction, he told the Individual Defendants that he did not believe Brian was the shooter because he was one of the teenagers who chased the perpetrator and flagged down the officers after the shooting occurred.

299. CRU interviewed defense counsel Harold Dusenberry. Dusenberry confirmed that neither the Individual Defendants, nor ADA Bjorneby, nor the KCDAO disclosed to him: (a) that Felix Fermin was incarcerated at the time of Brian's trial date; (b) that Fermin received a more lenient sentence on his pending drug charges in exchange for his cooperation and testimony against Brian; (c) that the KCDAO promised Fermin that it would provide a favorable letter to the parole board; (d) that Jones had refused to respond to several attempts by the KCDAO to contact him before trial and had not appeared in response to a subpoena.

300. All the evidence CRU reviewed from the 1988 investigation unmistakably exculpated Brian, as did all the evidence it newly gathered—and it revealed that that the police and prosecutors knew as much when they railroaded Brian into a guilty plea.

301. The result of CRU's investigation was inescapable: Brian was innocent. He did not commit the murder of Raphael Reyes.

302. Moreover, Brian did not enter into his plea knowingly, voluntarily, and intelligently because the Individual Defendants, ADA Bjorneby, and the KCDAO intentionally withheld and did not disclose exculpatory information.

303. Brian's conviction was vacated on July 1, 2025, by Kings County Supreme Court Justice Matthew D'Emic pursuant to CPL § 440.10(1)(h) as having been obtained in violation of his constitutional rights because his guilty plea was not knowing, voluntary and intelligent.

304. Justice D'Emic also dismissed Brian's indictment upon the People's representation that they no longer had sufficient evidence to prove Brian's guilt beyond a reasonable doubt. During the hearing on the motion to vacate, the People described the original criminal investigation and prosecution as one where "some evidence may have been disregarded. Some evidence may not have been reviewed. And investigative leads were not followed resulting in the involved parties failing to come to the proper conclusion that the Defendant was likely not the shooter." The People noted they "no longer ha[d] confidence in the integrity of the conviction."

## X. KNOWLEDGE AND CONDUCT OF THE INDIVIDUAL DEFENDANTS AND ADA BJORNEBY

305. The Individual Defendants chose to pursue and arrest Brian even though they lacked probable cause to do so and were aware of the following facts as of March 1, 1988:

a. Fermin and Jones provided accounts of the shooting that starkly differed from the first-hand, eyewitness accounts of the contemporaneous 911 calls, radio runs and dispatches, the statements of the police officers that first responded to the crime scene, the statement of Nicholas Ruiz, and the statement of Jessica "Odilka" DeSousa—all of which made clear that the shooter was a short, heavy-set middle-aged man that entered the Game Room from the outside before firing shots at Raphael, that a crowd had chased the shooter east down Cortelyou Road towards Flatbush Avenue and to Beverly Road

where he entered a getaway vehicle, and that "Brian" (in contrast to the shooter) was witnessed standing outside of the Game Room after the shooting wearing entirely different clothes than the shooter.

b. Tito Salgado and William Reyes provided statements implicating Patrick Sonen, "Fat Man" or "Fat Boy" as the shooter because of a dispute he had with Raphael, and Sonen provided no credible alibi or alibi witnesses.

c. Unlike Ruiz (who had been interviewed by NYPD officers in the back of a police car at the scene immediately after the shooting), there was no independent corroboration that Fermin or Jones were present at the Game Room at or around the time of the shooting.

d. Fermin provided a statement to Defendant Rooney that was materially inconsistent with the recorded statement he provided to ADA Weinman as outlined in paragraph 101, *supra*, in particular with respect to the shooter's movements after the shooting.

e. Fermin's and Jones's accounts of the shooter's movements after the shooting were starkly inconsistent with each other, rendering both non-credible.

f. Fermin did not provide Defendants with a physical description of the shooter he claimed to see.

g. Jones did not provide Defendants with a physical description of the shooter he claimed to see.

h. Fermin's and Jones's claims that they saw the shooter in the neighborhood prior to the shooting were non-credible because they did not provide any details of when or how they saw or knew the "shooter" or "Brian."

i. Fermin was a known drug dealer with substance abuse problems and pending criminal charges, providing him a motive to provide a statement falsely incriminating Brian as the shooter to obtain a favorable outcome on his criminal matters.

j. Additionally, at some point after Brian's arrest and before his conviction, Officer Platt affirmatively told the Individual Defendants that Brian was one of the teenagers who chased the perpetrator and flagged down the police after the shooting occurred.

306. After Brian's arrest, the Individual Defendants and ADA Bjorneby initiated and maintained criminal proceedings against Brian without probable cause, including securing Brian's indictment through fraud and bad faith, and with full knowledge of the above facts, as

well as the following—all of which made clear that Brian did not commit the murder of Raphael Reyes:

a. Sergeant Jerak and Officer Greco—independent witnesses that were located at Beverly Road and Flatbush Avenue—personally saw a crowd of individuals running on the street, appearing to chase someone, and yelling about a shooter. Those officers documented in real time that the shooter had fled in the vicinity of Beverly Road and East 22nd Street.

b. Officer Davis, another independent witness patrolling on Flatbush Avenue, also saw the crowd of individuals.

c. Officer Platt affirmatively stated that Brian was not the shooter because he was one of the teenagers who chased the perpetrator and flagged down the police after the shooting occurred.

d. Nicholas Ruiz—an eyewitness who was inside the Game Room at the time of the shooting and was interviewed immediately after the shooting—made clear that the shooter had entered the Game Room from the *outside* of the store, that a group of youths were playing video games inside the store at the time of the shooting, and that after the shooting, he along with a group of the teenagers had chased the shooter until he got into a car on Beverly Road just east of Flatbush Avenue. Ruiz also provided the very first physical description of the shooter as a short, heavy-set, middle-aged man. Ruiz's account was credible since it matched the accounts of Sergeant Jerak and Officer Greco of a crowd of individuals running down the street after the shooting.

e. Brian—a young, skinny teenager weighing only 125 pounds—did not match any physical description of the shooter.

f. Jessica "Odilka" DeSousa confirmed that she saw Brian outside the Game Room after the shooting and that he was wearing clothing far different from that of the shooter.

g. The accounts of the teenagers inside the Game Room at the time of the shooting—Anthony Bobb, Lawrence John, Kenneth Lowe—were credible because they matched the accounts of Sergeant Jerak, Officer Greco, Officer Davis and Officer Platt of a crowd of individuals running down the street after the shooting.

h. Fermin and Jones provided accounts of the shooting and the shooter's movements that starkly differed from statements of Sergeant Jerak, Officer Greco, Officer Davis, and Officer Platt—who all personally saw a crowd running down the street while they were located on Flatbush and Beverly Road. Fermin's and Jones's accounts of the shooter's movements after the

shooting were starkly inconsistent with each other, rendering both non-credible.

i. Defendants extracted false identifications of Brian from Fermin and Jones based upon unduly suggestive photo identification and lineup procedures.

j. On information and belief, the Individual Defendants provided false and incomplete testimony to the grand jury that falsely implicated Brian for the murder of Raphael Reyes and withheld information from the grand jury about Patrick Sonen, the statements of the police officers, and Nicholas Ruiz that exculpated Brian.

k. ADA Bjorneby knowingly presented false testimony by Defendant Minogue, Felix Fermin, and Shawn Jones to the grand jury, and ADA Bjorneby withheld information from the grand jury about Patrick Sonen, the statements of the police officers, and Nicholas Ruiz that exculpated Brian.

307. In addition to the facts alleged above, ADA Bjorneby proceeded with the criminal prosecution of Brian despite lacking probable cause to do so and with full knowledge of the following facts that made clear that Brian had not committed the murder of Raphael Reyes:

a. ADA Bjorneby was aware that Fermin and Jones had starkly inconsistent descriptions of the shooter's movements after the shooting. Indeed, ADA Bjorneby's case file contained a hand drawn map with arrows to show the shooter's movements according to Jones versus the shooter's movements according to Fermin—the discrepancy between their accounts was readily apparent.

b. ADA Bjorneby was told by Officer Platt that he did not believe Brian committed the murder because he had seen Brian outside the Game Room after the shooting. ADA Bjorneby concealed this information from Brian and defense counsel.

c. ADA Bjorneby was aware that Fermin had a motive and incentive to lie in light of the pending criminal charges against him, enhanced by ADA Bjorneby and the KCDAO's offer of a more lenient plea and sentence for those charges and ADA Bjorneby's promise to provide Fermin a letter to the parole board supporting his early release from prison. ADA Bjorneby intentionally concealed this information from Brian and his defense counsel.

d. ADA Bjorneby was aware that Jones had ignored his requests to contact the KCDAO and testify at trial and had refused to comply with the subpoenas he had been served, further underscoring the unreliability of Jones's testimony and identification of Brian as the shooter. ADA Bjorneby intentionally concealed this information from Brian and his defense counsel.

e. ADA Bjorneby was aware that statements exculpating Brian had been provided by Ruiz, Odilka, Tito, William and Officer Platt. ADA Bjorneby intentionally concealed these witnesses' information, identities and locations from Brian and his defense counsel.

308. All of the acts described above were committed by the Individual Defendants under color of state law and under their respective authorities as police officers and prosecutors, supervisors, and employees, acting within the scope of their employment.

## XI. THE CITY OF NEW YORK'S CUSTOM, PATTERN, AND PRACTICE OF IMPROPER AND DISHONEST POLICE AND PROSECUTORIAL MISCONDUCT AND THE FAILURE TO TRAIN, SUPERVISE, AND DISCIPLINE ITS EMPLOYEES

309. Before, during, and after the violation of Brian's constitutional rights—including at the time of his arrest, prosecution, and plea—Defendant City of New York had a policy or custom—whether formal or informal, and manifested by repeated decisions of final policymakers, or by the persistent, widespread, and longstanding practices of subordinate law enforcement officers and prosecutors—of the following:

a. NYPD officers "testilying" or fabricating false evidence, including witness statements, to support the police officers' preconceived perceptions or determinations of guilt, and then relying on such false evidence to claim probable cause to arrest suspects on criminal charges;

b. NYPD officers using unduly suggestive identification procedures to obtain false positive witness identifications of supposed suspects and then relying upon those false identifications to claim probable cause to arrest suspects on criminal charges;

c. NYPD officers knowingly offering false testimony, either from themselves or from witnesses, before a grand jury to secure an indictment;

d. NYPD officers failing to obtain, preserve, and timely disclose, during criminal investigations and prosecutions, all material evidence or information favorable to a person suspected, accused, or convicted of criminal conduct, including exculpatory evidence as well as evidence impeaching or undermining prosecution witnesses;

e. NYPD's failure to adequately instruct, train, supervise, and discipline employees with respect to such matters;

f. KCDAO prosecutors using false, misleading, or unreliable evidence, testimony, statements, or argument during criminal proceedings, including bail hearings, pretrial hearings, trials, and post-conviction proceedings;

g. KCDAO prosecutors failing to correct false, inaccurate, incomplete, or misleading evidence, testimony, statements, and argument, whenever such misconduct was discovered to have occurred;

h. KCDAO prosecutors failing to obtain, preserve, and timely disclose, during criminal investigations and prosecutions, all material evidence or information favorable to a person suspected, accused, or convicted of criminal conduct, including exculpatory evidence as well as evidence impeaching or undermining prosecution witnesses; and

i. KCDAO's failure to adequately instruct, train, supervise, and discipline employees with respect to such matters.

310. The City's unlawful policies and custom of unconstitutional conduct described above are illustrated through repeated, longstanding, and widespread instances of such conduct carried out by the Individual Defendants, ADA Bjorneby, the NYPD, and the KCDAO in criminal proceedings and convictions in the 1980s and the 1990s and even after—i.e., both before and after Brian's arrest and conviction.

311. All of the acts by the Individual Defendants and ADA Bjorneby described above were carried out pursuant to City policies and practices which were in existence at the time of the conduct alleged herein and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the defendant City and its agencies, the NYPD, and the KCDAO.

**A. The Individual Defendants Fabricated Evidence and Pursued Individuals without Probable Cause in Other Cases**

312. **1988: Sami Leka**: At the same time that Defendants Minogue and Rooney were investigating the homicide of Raphael Reyes, they were investigating the homicide of Rahman Farati, who was shot and killed on February 12, 1988, in Brooklyn. Prior to his death, Farati had

been involved in a custody dispute over his grandchildren with the children's uncles, Zeni and Luftim Cira. Zeni and Luftim's sister was married to a man named Sami Leka.

313. As with Brian, Defendants Minogue and Rooney zeroed in on Leka as the shooter despite the existence of evidence contradicting that theory: namely, that Zeni was the one who committed the murder—not Leka. Defendants Minogue and Rooney participated in an investigation where two eyewitnesses were presented with an unduly suggestive photo array, in which the photograph of Leka (a light-skinned, Albanian man) differed drastically from the other photographs (five darker-skinned Hispanic men). Based on information improperly supplied by the NYPD to the eyewitnesses that implicated Leka as the perpetrator, the eyewitnesses picked his photograph out of the photo array and, later, out of a lineup at the 70th precinct.

314. The NYPD officers ignored Farati's dying utterance stating that he had been shot by Zeni Cira. They also ignored several exculpatory statements from eyewitnesses to the murder—including from an off-duty police officer, a bus driver, and a postal worker—that contradicted the statements of the eyewitnesses who had identified Leka in the photo array, including, critically, the physical description of the shooter.

315. The NYPD and KCDAO withheld exculpatory evidence from the grand jury that indicted Leka, including the victim's statement and the statement of eyewitnesses that contradicted those of the witnesses that had falsely identified Leka in the photo arrays and lineup. The NYPD and KCDAO also did not disclose to the grand jury that the identification of Leka in photo arrays and a lineup was the result of improper coaching and coercion and unduly suggestive procedures.

316. The ADA in the KCDAO that handled Leka's prosecution did not disclose that the testimony of the off-duty police officer would contradict the testimony of the identification

witnesses, and in fact, falsely represented to Leka's defense counsel that the off-duty police officer's testimony would be favorable to the prosecution; and the ADA did not disclose exculpatory statements from other eyewitnesses until it was too late for Leka to interview them or secure their testimony at trial.

317. As a result of the misconduct by the Defendants Minogue and Rooney, the NYPD, and the KCDAO, Leka was convicted in 1990 and served almost 12 years in prison.

318. Shortly after his 1990 conviction, Leka moved to vacate his conviction because the prosecution intentionally suppressed a variety of *Brady* information. Not only did the KCDAO vigorously oppose Leka's motion and appeal, but former DA Charles Hynes wrote that he had "personally reviewed the facts and circumstances" of the case and "Leka's due process rights as a defendant were amply and ably protected." As a result, Leka's state court post-conviction motions to vacate his conviction were denied.

319. However, in 2001, the Second Circuit Court of Appeals granted Leka's petition for habeas corpus, finding that the KCDAO had actively "suppressed" exculpatory evidence and concluding that the evidence would have had a "seismic impact" upon the results of the trial. *See Leka v. Portuondo*, 257 F.3d 89 (2d Cir. 2001). With the only two identification witnesses having recanted their testimony, the KCDAO was forced to dismiss the case against Leka.

320. Leka subsequently filed a civil rights lawsuit against the City, which was settled.

321. The misconduct committed by Defendants Minogue and Rooney in the *Leka* case is exactly the same kind of misconduct they committed in Brian's case.

### B. ADA Bjorneby Withheld *Brady* and *Giglio* Material and Prosecuted Individuals without Probable Cause in Several Other Cases

322. Prior to Brian's arrest in March 1988, ADA Bjorneby engaged in misconduct in at least the following cases:

323. **1985: David McCallum & William Stuckey**: Before securing Brian's wrongful conviction, NYPD officers and ADA Bjorneby investigated, prosecuted and obtained the wrongful conviction of 16-year-olds David McCallum and Williams Stuckey.

324. On October 20, 1985, two men forced Nathan Blenner into his Buick Regal and kidnapped him in Queens, New York. His body was found the next day in Brooklyn, while his burnt car was found the day after that on Fulton Street in Brooklyn.

325. About twenty minutes before Blenner's abduction, one of his neighbors—Kathy Hank—was washing her car (also a Buick Regal) when two men walked by and said she had a nice car. Hank told them that if her car were to be stolen, she would "know where to look." Hank described the two men as 5'6" and 5'10" and one with his hair in braids.

326. NYPD officers were aware that, in the 48 hours prior to Blenner's abduction, there were eight robberies in Blenner's neighborhood where the victims' cars were stolen by Black men whose descriptions matched those provided by Hank.

327. Five days after Blenner's abduction, NYPD officers arrested Herman Munford and Terrence Heyward for robbery in Queens. Heyward lived not far from where Blenner's body was found and worked at a hardware store that sold the same kind of kerosene can that had been found inside Blenner's burnt out car.

328. NYPD Detective Butta interviewed Munford and Heyward. Heyward said that he knew a black male named "Supreme" who was trying to sell a gun that had a "body to it." Detective Butta failed to record on the DD5 of that interview that Munford had already been questioned by the NYPD at least twice about Blenner's death. When Detective Butta questioned a man named James Johnson about his gun, Johnson named Stuckey as "Supreme" and admitted to using his gun in a shooting in a grocery store.

329. The NYPD did not second guess Johnson's story, nor did they investigate the grocery store shooting. In fact, Detective Butta agreed to forget about the grocery store shooting if Johnson testified to Stuckey's purported connection to the gun.

330. On October 27, 1985, police arrested 16-year-old William Stuckey, handcuffed him in a room with three detectives for hours, beat him, and coerced him into giving a false confession—the details of which, regarding the car and gun, did not match the evidence—all the while promising him he could go home if he just regurgitated the script they had given him.

331. Soon after coercing Stuckey's confession, police arrested 16-year-old David McCallum, handcuffed him, slapped him, threatened to hit him with a chair, and coerced a confession from him—which also contained inconsistencies and false facts fed to him.

332. The NYPD officers knew that Stuckey and McCallum did not kill Blenner: there was no physical evidence, no DNA evidence, no identification, and no fingerprint evidence linking either boy to the car or to the crime. Police also discovered that, shortly after Blenner's abduction, his credit card was used to buy gas for his vehicle—indicating that the perpetrators had likely driven the car around for several hours and then paid an attendant to fill the car with gas. The likelihood that that was done by two unlicensed 16-year-old boys who could not drive was slim to none.

333. Stuckey and McCallum immediately recanted their confessions and pled not guilty, rejecting plea bargain offers, and opting for trial.

334. ADA Eric Bjorneby prosecuted McCallum and Stuckey. ADA Bjorneby withheld several pieces of favorable evidence from McCallum and Stuckey: the NYPD's multiple interviews of Munford, including one interview that occurred when Munford rode his bike past the crime scene on the *same* day that officers found Blenner's body; ADA Bjorneby's interview

of Munford at a NYPD precinct and notes from that interview; audio recordings of Detective Butta's interviews with Munford, Johnson, and two children who saw the men that abducted Blenner and provided physical descriptions that differed from the appearances of McCallum and Stuckey. Moreover, defense counsel never learned that Detective Butta visited Hank after her own Buick Regal was stolen and Hank did not identify anyone in the mug books—books that contained photographs of McCallum and Stuckey.

335. ADA Bjorneby and Detective Butta intentionally hid the evidence that linked Munford and Heyward to the murder and identified them as the two men that had accosted Hank twenty minutes before Blenner's abduction. At trial, Stuckey's defense lawyer cross-examined Detective Butta and asked him about Hank. When ADA Bjorneby heard Hank's name, he immediately objected and asked for a sidebar. The judge then questioned Detective Butta about Hank and specifically asked Butta what time Hank indicated she had been accosted by the two men. Detective Butta lied, responding that the Hank incident occurred at noon, when in fact it occurred at 2 p.m. (only 20 minutes before the murder). Detective Butta also lied by claiming that Hank was unable to give him a physical description of the two men and that he could not remember if she had described the two men as 5'6" and 5'10" tall and one with braids. Detective Butta and ADA Bjorneby both knew that this testimony was contradicted by the DD5 form that confirmed Hank's physical description of the two men, the time she saw them, and that she was willing to view mugshots. Detective Butta and ADA Bjorneby also avoided disclosing to the jury that Detective Butta had shown mugbooks to Hank, and she had not identified anyone in them.

336. Not only did ADA Bjorneby fail to disclose that Detective Butta had shown photographs to Hank, ADA Bjorneby actively misled the jury by stating that Hank's incident occurred at noon instead of 2 p.m., even though he knew that Hank's incident occurred only

twenty minutes before Blenner's abduction. ADA Bjorneby then used this false statement to argue that the jury should disregard Hank's statements because her incident occurred hours before Blenner's abduction.

337. ADA Bjorneby presented the jury with testimony of James Johnson, who received substantial leniency on his own criminal case in exchange for testimony that ADA Bjorneby knew or should have known was fabricated.

338. In 2014, CRU moved to vacate McCallum's and Stuckey's convictions. DA Ken Thompson determined that "not a single piece of evidence" linked McCallum or Stuckey to the crime. McCallum's and Stuckey's motions to vacate their convictions were granted on October 15, 2014.

339. McCallum subsequently settled his civil suit against the City, as did Stuckey's estate (Stuckey died in prison in 2001).

340. **1987–1988: Robert Hill, Darryl Austin, and Alvena Jennette**: In 1988, ADA Eric Bjorneby prosecuted and obtained the wrongful conviction of half-brothers Robert Hill, Darryl Austin, and Alvena Jennette for murders based on inconsistent and contradictory testimony by a police informant and drug user, whose evidence should never have been credited.

341. In at least six cases, Detective Louis Scarcella gave food and money to Teresa Gomez, who was addicted to crack and engaged in prostitution, in exchange for her testimony that she witnessed multiple homicides—including the September 1985 killing of Ronnie Durant, the January 1987 killing of Donald Manboardes, and the December 1986 killing of Bruce Siblings.

342. In the first of these three trials—against Robert Hill in 1988 for the murder of Bruce Siblings—Gomez claimed to have been hiding inside a closet in a crack house when

she saw Hill shoot Siblings through a keyhole in the closet door. But a defense investigator that visited the crime scene testified that the closet door had no keyhole. Later, when Hill's lawyer questioned Gomez about the Manboardes murder, she told the jury she had not seen that shooting. Hill was acquitted. From at least that point forward, ADA Bjorneby knew that Gomez was an unreliable and perjurious witness.

343. Nevertheless, when the second of these cases went to trial—against Hill for the murder of Manboardes—the KCDAO again presented the testimony of Detective Scarcella and Gomez. Despite her testimony in the Siblings case that she had not witnessed the Manboardes murder, Gomez told the Manboardes jury that she saw Hill and Manboardes arguing and then saw Hill shoot Manboardes. This time Hill was convicted of murder.

344. Another ADA involved in the prosecution of Hill for the Manboardes murder has since publicly written of Gomez: "[She was] a woman who was even then ravaged from head to toe by the scourge of crack cocaine. . . . It was near folly to even think that anyone would believe Gomez about anything, let alone the fact that she witnessed the same guy kill two different people."[2]

345. The KCDAO then used Gomez *again* as a trial witness in the 1988 trial of Austin and Jennette for the murder of Durant. Despite knowing that she had perjured herself in the Hill trials, Detective Scarcella produced Gomez as a witness to the Durant murder, and the KCDAO presented her testimony at the trial of Austin and Jennette. Gomez testified that she had seen the half-brothers rob and kill Durant in a shootout between Durant and the brothers. But no gun was found in Durant's possession, nor was there any evidence any other gun had been used.

[2] David Brown, *Star Detective and the Addict He Could Always Rely on as a Witness*, TIMES, (May 14, 2013), https://www.thetimes.com/uk/crime/article/star-detective-and-the-addict-he-could-always-rely-on-as-a-witness-z7qgpn3lhrs.

Her testimony was so bizarre and so wildly different from another witness's account of the shooting, that counsel requested the court order urinalysis of Gomez during trial, suspecting her fantastical testimony was the product of drugs.

346. Trial prosecutors failed to disclose to Austin's and Jennette's defense counsel that an eyewitness identified someone else as the shooter. Moreover, the first detective assigned to the Durant investigation had interviewed two people who said Austin and Jennette were present when the killing took place but did not take part in it. The KCDAO never shared the detective's notes with the defense at trial, nor any of the nine times Jennette challenged his conviction over the next two decades.

347. All three men's convictions were vacated in 2014 after DA Ken Thompson found that, "[b]ased on a comprehensive review of these cases, it is clear that testimony from the same problematic witness undermined the integrity of these convictions, and resulted in an unfair trial for each of these defendants. . . We therefore have moved to vacate these convictions and dismiss the charges in the interest of justice."

348. Jennette and Hill entered a prelitigation settlement with the City, as did Austin's estate (Austin died in prison).

### C. The NYPD and KCDAO Engaged in Evidence Fabrication, Unduly Suggestive Identification Procedures, Withholding of *Brady* and *Giglio* Material, and the Prosecution of Individuals without Probable Cause in Dozens of Other Cases

349. Prior to and after Brian's arrest, NYPD and KCDAO personnel engaged in the unlawful practices described in paragraph 309, *supra*, in at least the following cases and caused the wrongful conviction and wrongful incarceration of numerous individuals:

350. **1980: Raymond Mora, Amaury Villalobos, William Vasquez**: Mora, Villalobos, and Vasquez were convicted of felony murder and arson stemming from six deaths that occurred during a residential fire. A witness, J.P., owned the residential building and was at

home on the night of the fire. J.P. testified at trial that she heard the defendants speaking Spanish in the hallway that night, observed them leaving the building, heard a loud "boom," and then saw heavy black smoke coming from the first floor. A CRU investigation 2015 revealed that J.P. (as with Fermin in Brian's case) had a motive to lie because of pending criminal charges at the time of her testimony, was a known alcoholic that lied frequently, and made statements to the police were inconsistent with each other. Villalobos and Vasquez each served approximately 32.5 years in prison, while Mora died in prison after close to 10 years, before their convictions were vacated in 2015 as a result of CRU's reinvestigation of their cases and recommendation.

351. **1982: Colin Warner**: Colin Warner was convicted in 1982 of the 1980 fatal shooting of Mario Hamilton. As with Brian, the NYPD engaged in unduly suggestive identification procedures: the victim's brother asserted that a member of the NYPD pressured him into picking out a photograph of Warner as someone he may have seen near the scene of the crime. Warner's motion to vacate his conviction was granted in 2001.

352. **1982: Detroy Livingston**: On December 11, 1982, a man reported a shooting death in Brooklyn, and police responded four minutes later to find two convenience store employees shot, one of whom was dead. As here, the NYPD and KCDAO relied upon plainly unreliable and contradictory testimony to convict then-18-year-old Detroy Livingston. The surviving victim had said two Black men, one of whom had a stocking over his face, had held up the store at gunpoint and then killed the other employee, though they had not stolen anything. Two weeks after the shooting, 19-year-old Tracey Evans (like Fermin, an active drug user and addict, in Brian's case), went to the police precinct and said three men had bragged to her that they had committed the shooting. But when she was interviewed in subsequent months, her story changed significantly each time. Moreover, as with Jones in Brian's case, Evans's version of

events was physically impossible and revealed she was not a reliable witness: Evans claimed that she saw the shooting inside the store through the store window, but when police had arrived at the crime scene, the window gate was drawn down and padlocked. And, as with Patrick Sonen in Brian's case, the police also had evidence that a man nicknamed "Life" was the killer but failed to pursue that lead. The jury—who did not know of Evans's prior wildly contradictory statements—convicted Livingston. After an investigation by CRU, Livingston's conviction was vacated on November 3, 2023. Livingston subsequently obtained a $9,100,000 wrongful conviction award and a $4,700,000 Court of Claims settlement.

353. **1982: Calvin Boyette**: In 1982, Regina Ehrlich was attacked in her home by two young men, who set her house on fire and left her to die. Ehrlich initially told the NYPD officers that she thought a neighbor in her building, Calvin Boyette, was one of the young men, but she also said she was not sure, wanted to see a photograph of Boyette, and both men wore masks during the attack. As with Brian, NYPD officers arrested Boyette even though the physical description of the perpetrator did not match: Ehrlich told officers that one of her attackers was missing teeth, but Boyette was not. And as with Brian, the KCDAO failed to disclose key *Brady* material: that Ehrlich was initially uncertain when she named Boyette as an attacker, and the NYPD noted that no accelerant was used in the arson (contradicting Ehrlich's claim that a greasy substance had been smeared on her face). Boyette was eventually convicted in 1984 of attempted murder and arson. After his direct appeals were denied, Boyette successfully obtained a grant of habeas corpus due to the *Brady* violations. *See Boyette v. LeFevre*, 246 F.3d 76 (2d Cir. 2001).

354. **1984: Nathaniel Carter**: In 1984, Nathaniel Carter filed a federal civil rights lawsuit against the City for his wrongful conviction for the 1981 murder of Clarice Herndon in Queens, New York. Carter alleged that the NYPD officers investigating the murder deliberately

suppressed exculpatory statements of two witnesses (one of whom was a police officer) who said that they saw a man running down the street near the victim's home after the murder with a bloody shirt. As with Brian, NYPD officers arrested Carter even though he did not match the physical description of the perpetrator. Carter alleged that the NYPD officers' conduct was the result of the City's failure to either adopt an adequate policy regarding the collection and handling of exculpatory evidence or to provide adequate training on such evidence. In 1985, a federal district court held that Carter had raised triable issues of fact on the NYPD's policies and practices and refused to dismiss his lawsuit. *See Carter v. Harrison*, 612 F. Supp. 749, 751 (E.D.N.Y. 1985).

355. **<u>1986: Todd Lumpkins</u>**: In October 1988, a state trial court judge vacated the 1987 conviction of Todd Lumpkins for murder. Lumpkins had been arrested and convicted for the 1986 shooting of Anthony Joseph in his apartment. The trial court found that—like in Brian's case—*Brady* and *Rosario* material had been willfully suppressed by the NYPD and KCDAO that pointed to a third party suspect and exculpated the defendant: a DD5 documenting a telephone call made to the NYPD Crime Stoppers Unit to report that Lumpkins did not murder Joseph, naming two other men as the murders, providing a motive for their murder of Joseph, and providing physical descriptions of the two men that matched descriptions provided by Joseph's neighbor of two men he had seen entering the apartment building. *See People v. Lumpkins*, 141 Misc.2d 581, 588 (Sup. Ct., Kings Cnty. 1988).

356. **<u>1986: Floyd Batten</u>**: In 1983, Floyd Batten was tried for the murder of a furniture store owner in Brooklyn based on the testimony of a store employee who identified Batten from a book of mugshots. As with Brian, KCDAO prosecutors withheld *Brady* material that implicated a third party perpetrator and NYPD interviews with that third party suspect: shortly

after the shooting and Batten's arrest, a confidential informant had told the NYPD that someone other than Batten had committed the robbery, and police reports at the time found that lead to be credible and merit additional investigation. The Eastern District of New York held that the failure to disclose this police report, along with several other police reports documenting interviews and investigation of the other suspect, constituted a *Brady* violation and granted Batten's petition for a writ of habeas corpus in 2003. *Batten v. Griener*, No. 03-MISC-0066 (JBW), 2003 WL 22284187 (E.D.N.Y. Aug. 26, 2003).

357. **1986: Keith Roberts**: As with Brian, the KCDAO and NYPD withheld *Brady* material, engaged in unduly suggestive identification procedures, and ignored third-party culpability evidence in the arrest and prosecution of Keith Roberts for the 1986 murder of Pierre Sanon in Brooklyn. The outcome of the trial hinged on the credibility of a single eyewitness, Jerome Pierre, who testified that he saw Roberts shoot the victim twice. On the eve of trial, the KCDAO disclosed a statement taken from a second eyewitness on the day of the shooting in which the eyewitness provided a completely different account of the shooter's movements after the shooting than Pierre's account. The Second Department found that the belated disclosure constituted a *Brady* violation because the statement bore directly on the credibility of eyewitness Pierre and was disclosed too late for Robert's counsel to find the second witness and use the statement effectively. *See People v. Roberts*, 203 A.D.2d 600, 601 (2d Dep't 1994). The KCDAO also failed to disclose additional exculpatory evidence: (1) an eyewitness had failed to identify Roberts in a lineup, and (2) the decedent's brother had given police a list of suspects a mere two days after the shooting, and that list did not include Roberts but *did* include the prosecution's star witness, who pointed the finger at Roberts in a patently incredible story in order to direct blame away from himself. That star witness identified Roberts in a lineup where

NYPD officers suggested which person to pick out. On October 3, 2024, Roberts was finally exonerated 37 years later.

358. **1987: Anthony Faison & Charles Shepherd**: In 1987, Faison and Shepherd were arrested for the murder of a livery cab driver in Brooklyn. Ignoring fingerprint evidence that did not match either Faison or Shepherd, the lead NYPD detective (as with Brian) intentionally fed information from the police investigation to a drug dealer informant to fabricate witness statements incriminating Faison and Shepherd. That informant, in turn, provided the information fed to him by the NYPD detective to one of the informant's customers, who then falsely claimed to have witnessed the murder. The NYPD paid both the drug dealer/informant and the customer for their cooperation and testimony. Notably, the resulting story from the alleged eyewitness/customer did not match the evidence and (as with Brian) was not physically possible. No reasonable detective should have credited the made-up story. Nonetheless, the NYPD used an unduly suggestive lineup (as with Brian) to obtain false identifications of Faison and Shepherd. In one of the dozens of interactions (and transactions in which the NYPD paid the "eyewitness" for her "information"), the eyewitness recanted and admitted she did not witness the murder, but the NYPD detective threatened her with jail if she did not maintain the lie. The detective then withheld the witness's recantation from Faison and Shepherd in their 1988 trials, even though that should have been disclosed as *Brady/Giglio* material. Many years later, the NYPD tested the fingerprint evidence, which led to the arrest of a man named Arlet Cheston who confessed to having committed the murder. Faison and Shepherd's convictions were vacated in 2001, and the men pursued a damages action for their wrongful conviction.

359. **1987: Gerard Domond**: On March 26, 1987, Francois Pierre falsely accused Gerard Domond of shooting Patrick Hinkson because of a dispute over money for drugs. Like

Brian, the KCDAO charged Domond with murder even though Domond had multiple exculpatory witnesses that confirmed he was in Georgia at the time of the shooting, and Pierre's account of the murder did not match the evidence. And, as with Fermin in Brian's case, the KCDAO never disclosed to Domond's defense that Pierre received leniency for drug, gun possession, and robbery charges he was facing. Domond was convicted of Hinkson's murder. Over 20 years later, after 17 years of wrongful incarceration, Domond's conviction was vacated after a CRU investigation confirmed Pierre was an unreliable witness and the KCDAO had withheld *Brady* material before trial (including that Pierre had been in a psychiatric ward days before he signed his cooperation agreement and testified at trial). Domond received $8.4 million in compensation from the City and settled his Court of Claims claim for $5.5 million.

360. **<u>1988: Nathan May</u>**: In 1988, Nathan May was convicted of murder, attempted murder, and assault. Eight years later, in 1996, the Second Department ordered a new trial on the basis that the KCDAO had failed to provide critical *Brady* material—that the key eyewitness against him was promised a favorable sentence in exchange for his testimony—and had also failed to correct that witness when he testified at trial that he had not made a deal with the prosecution. *See People v. May*, 228 A.D.2d 523 (2d Dep't 1996).

361. **<u>1988: Carlos Davis</u>**: Carlos Davis was wrongfully accused of the shooting of Norris Williams in September 1988. As with Brian's case, NYPD officers found an unreliable witness to generate a false incriminating statement against Davis: Kristie Hayes was fed a false narrative and coached by NYPD officers on how to testify against Davis. And, as with Fermin in Brian's case, NYPD officers and the KCDAO made explicit and implicit promises to induce Hayes to testify, including promises to help her family and protect her from uncharged criminal conduct for which she was facing at the time. The KCDAO never disclosed *Brady* material to

Davis, including (a) that Hayes lied about her identity, how she came to testify, and what she saw on the night of the shooting; (b) that the prosecution's file contained a document ("Receipt for Autopsy Evidence," dated September 22, 1988) indicating that Williams was shot and killed by a .38 caliber weapon, matching the ammunition found in the jacket that was placed under Williams's head immediately after the shooting; (c) that Hayes was in jeopardy for uncharged criminal conduct at the time she testified; or (d) any other *Brady* material concerning Hayes. While Davis was acquitted of the murder, he was convicted in 1991 of criminal possession of a weapon in connection with Williams' death, and he was incarcerated until 1997. Following a CRU reinvestigation, Davis's conviction was vacated in 2015.

362. **1989: Barry Gibbs**: On November 4, 1986, Virginia Robertson was found strangled to death lying under a blanket near a Brookyln highway. An eyewitness had told the NYPD that, when jogging on the day of the crime, he had seen a white man pull a body out of the passenger side of a car, lay it on the ground, and cover it with a blanket. As with Fermin in Brian's case, the NYPD extracted a false identification of Gibbs from the jogger, even though Gibbs did not match the initial physical description of the perpetrator. And, as with Brian's case, the NYPD did not ask another eyewitness to view Gibbs in a lineup because the NYPD knew the other eyewitness would not identify Gibbs as the perpetrator. Ignoring the mountain of evidence that Gibbs was not guilty, the KCDAO prosecuted him. Gibbs was convicted and later exonerated in 2005 after the jogger recanted his lineup and trial identifications of Gibbs.

363. **1989: Derrick Deacon**: Derrick Deacon was convicted in 1989 of the murder of Anthony Wynn. As in Brian's case, the NYPD used an unreliable witness to generate false evidence against Deacon, even when that testimony did not match any of the other evidence in the case. And as with Brian, the NYPD and KCDAO failed to disclose *Brady* material: an

eyewitness named Colleen Campbell had seen the shooter's face clearly; not only did she provide the NYPD with a physical description of the shooter that did not match Deacon, but she also told the NYPD that she recognized Deacon from the neighborhood, and Deacon was *not* the shooter she saw fleeing the scene. Although the KCDAO eventually turned over a DD5 recounting Campbell's description of the shooter, the prosecution never disclosed that Campbell had repeatedly negatively identified Deacon. Instead, the KCDAO argued that Campell had not clearly seen the shooter. The Appellate Division vacated Deacon's conviction and the case was re-tried in 2013. It took the jury all of nine minutes to acquit Deacon of all charges once it heard all the evidence.

364. **1989: William Lopez**: In 1989, a drug dealer named Elvin Zorilla was shot and killed during a robbery. As with Brian's case, the NYPD used unduly suggestive and coercive methods to generate false incriminating statements from unreliable witnesses and false identifications of Lopez as the perpetrator. The NYPD threatened one witness, Daisy Flores, with jail time if she did not identify Lopez (a 5'7" Hispanic man) as the shooter even though Flores described the shooter as a 6'3" Black man. Flores picked Lopez out of a photo array in which Lopez's photo was already circled, but she could not pick Lopez out of a lineup. The NYPD also used its unduly suggestive photo array and the threat of incarceration to influence another witness, Annie Burnell, a crack addict, into identifying Lopez as the shooter. The KCDAO engaged in multiple *Brady* violations, as with Brian, including withholding from Lopez that Burnell had recanted as soon as she was released from NYPD custody and refused to appear at trial. The NYPD then pressured Janet Chapman, a prostitute with a crack addiction who frequented the area that was the crime scene (like Fermin in Brian's case), to identify Lopez in a lineup—threatening her with prosecution and incarceration if she did not identify Lopez and

keeping her at Rikers until trial to avoid any chance she would recant. Like with Fermin in Brian's case, the KCDAO also offered her a plea deal to testify against Lopez consistently with her statements at the police station, but it withheld this information from Lopez as well. The KCDAO instructed Chapman to testify that she had not received any deal in exchange for her testimony and, when she provided that false testimony, the KCDAO did nothing to correct the record. While Chapman was incarcerated, she told another prisoner about her false testimony, and that prisoner wrote the KCDAO to alert them—but the KCDAO also withheld *this* information from the defense and again did nothing. The KCDAO and NYPD had also ignored Lopez's two alibi witnesses and failed to interview several other key witnesses, already dead-set on pinning the murder on Lopez. Lopez was convicted in 1990 of murder. In 2013, after 23 years of incarceration, a federal district court granted Lopez's habeas petition on the basis of compelling evidence of his actual innocence, ordered his release, dismissed the indictment against him, and barred the State from retrying Lopez for the murder. *Lopez v. Miller*, 915 F. Supp. 2d 373, 435 (E.D.N.Y. 2013).

365. **1989: Jonathan Fleming**: Jonathan Fleming was convicted in 1990 of the 1989 fatal shooting of Darryl Rush. As with Brian, the NYPD and KCDAO prosecuted Fleming even though he had alibi witnesses. Fleming also had evidence documenting his presence in Disney World in Florida on a family vacation at the time of the murder: Fleming paid a phone bill in person at a Florida hotel just 14 hours before the shooting, and an Orlando police report noted that hotel employees remembered Fleming being at the hotel. The KCDAO did not disclose any of this *Brady* evidence to Fleming's defense counsel. The KCDAO and NYPD relied on the unreliable testimony of Jacqueline Belardo, an admitted crack addict (like Fermin in Brian's case), who falsely testified at Fleming's trial that she witnessed the shooting and recognized

Fleming as the shooter. After Fleming was convicted, but before sentencing, Belardo recanted her testimony and said she identified Fleming at trial only because NYPD officers threatened her with jail time on an unrelated felony larceny charge. Her recantation was corroborated by evidence of that larceny arrest and the charge's subsequent dismissal. However, the KCDAO claimed Belardo was lying when she recanted her testimony. Fleming's conviction was not vacated until in 2014. Fleming settled his civil rights claim for $6.2 million.

366. **1990: David Ranta**: On February 8, 1990, an armed assailant killed Rabbi Chaskel Werzberger during a botched robbery. As with Brian's case, the NYPD ignored evidence pointing to a third-party suspect, instead manufacturing false evidence again David Ranta through unduly suggestive identification procedures and a patently unreliable witness facing criminal charges. Eyewitnesses described the gunman as tall, blonde, and shaven; others told the NYPD that a man named Thomas Joseph Astin had shot Werzberger. Astin, however, died in a car crash when being pursued by police in April 1990. NYPD officers, including Detective Louis Scarcella, chose to focus on Ranta as a suspect and obtained a statement from convicted robber and drug addict Alan Bloom, who was in jail facing charges that could send him to prison for life. Bloom claimed that he and Ranta were involved in an attempted robbery that led to Werzberger's shooting. Like Fermin in Brian's case, Bloom testified against Ranta after being granted immunity for his involvement in the robbery and murder and a promise for a reduced sentence on his pending robbery charges. After Ranta was arrested, NYPD officers used an unduly suggestive lineup procedure, including several NYPD officers as fillers; and fillers that were significantly heavier, taller, and younger than Ranta. When a teenage witness did not identify Ranta as the shooter, NYPD officers and the ADA on the case coached the teen to

identify Ranta, which he then did.[3] One of the witnesses who identified Ranta in the lineup said Detective Scarcella told him to pick "the guy with the big nose," so he picked Ranta because he had the biggest nose. The KCDAO failed to disclose *Brady* material in its possession regarding the initial suspect Astin, including photographs of Astin as a blonde man, a conversation with Astin's parole officer, and a visit to Astin's wife after his death. Ranta was convicted of Werzberger's murder in 1991. In 2013, after twenty-three years of wrongful incarceration, Ranta's conviction was vacated. He later settled his civil rights claim against the City.

367. **1990: Jeffrey Blake**: On June 18, 1990, two young men were gunned down while they sat in the front seat of a car in Brooklyn by a lone gunman. As with Brian's case, the NYPD obtained a false statement from an unreliable witness and an unduly suggestive identification that implicated Jeffrey Blake: a frequent informant, Dana Garner, walked into the police station a week after the crime and claimed to see Blake commit the murders, even though that statement did not match that of a confirmed eyewitness or other evidence. As with Brian, the NYPD then arrested Blake and put him in an unduly suggestive lineup for Garner to pick him out (while failing to show the lineup to the actual eyewitness to the crime, who the NYPD knew would not identify Blake). Garner was the only prosecution witness tying Blake to the crimes, but the KCDAO failed to disclose his identity to the defense until the middle of trial, on the very day he was set to testify. And the KCDAO never disclosed that Garner had been a police informant or that he had later claimed to witness another murder mere hours before walking into the precinct to inculpate Blake but had said nothing about it, which was plainly unbelievable. Blake was

---

[3] When the judge presiding over Ranta's criminal trial later heard the audiotape of the lineup, he told the ADA on the record: "The more I hear this the more I am disillusioned with the work of the detectives. . . . [T]hose two [detectives] should be spoken to by your office. I think what they have done in this case, in my opinion, is decide that Mr. Ranta was the guilty person, the guilty party, and then they went out of their way to make sure it tied up neatly in a package. . . . We have a D.A. taking an audiotape. This is the first audiotape I've heard where a D.A. permits a detective to be talking and mumbling where we can't hear what they are saying in the background. I never heard that on any tape. . . . All I'm saying, there is an appearance of something wrong."

convicted and sentenced to two consecutive 18-to-life terms for murder. Blake's conviction was vacated in 1998 on the basis that Garner had fabricated his testimony and Blake's factual innocence.

368. **1990: Emel McDowell**: On October 27, 1990, one shooter fired a single shot into Jonathan Powell's chest outside of a community center, killing him. The NYPD investigation lasted only one day. The NYPD interviewed myriad witnesses, but only three claimed to have seen the shooting (Devine Thomas, Raheem Graham, and Danny Blackman), and only one (Blackman) named Emel McDowell as the shooter. Blackman's statements to the NYPD, however, were internally inconsistent and noncredible: Blackman placed himself both inside the community center and outside the community center at the time of the shooting; Blackman could not have witnessed the shooting from where he said he was standing at the time of the shooting; and Blackman's description of the victim chasing the shooter forty to fifty feet after being shot in the lungs and heart, and then up an incline another forty to fifty feet, was not possible. Moreover, the witnesses described the shooter wearing a jacket that did not match the jacket worn by McDowell at the time of the shooting. Based only on Blackman's patently incredible statement, the NYPD arrested McDowell. Like in Brian's case, the NYPD ignored eyewitnesses that pointed to a different suspect as the shooter, not McDowell. Instead, the NYPD used improper identification procedures: when Thomas could not pick anyone from a lineup, Blackman told Thomas he knew that #4 (McDowell) was the shooter, at which point Thomas picked #4. As a result of the KCDAO knowingly presenting the false testimony of Blackman and Thomas at trial, and withholding various witness statements from McDowell's defense counsel, McDowell was convicted of murder. In 2022, after the CRU began investigating McDowell's conviction, another man confessed to the murder. In 2023, McDowell's conviction was vacated.

369. **1992: Antonio Yarbough and Sharrif Wilson**: On June 18, 1992, 18-year-old Antonio Yarbough came home to find that his mother Annie, 12-year-old sister, and 12-year-old family friend had been tied up, stabbed, and garroted with electrical cords. That same day, NYPD officers physically and psychologically coerced Yarbrough and his 15-year-old friend Sharrif Wilson to confess falsely to the murders. As with Brian's case, the NYPD ignored third-party culpability evidence and failed to document their knowledge about other suspects on DD5s: a witness who had been with Annie on the night of the murder told NYPD officers that Annie argued with a man over drugs, the man pulled a knife on Annie, and he said he would be back later that night for money. Another witness told NYPD officers that she had been in Annie's apartment just a few hours before the killings and saw Annie using drugs with another unidentified man. Yarbrough and Wilson were convicted and served nearly 22 years in prison before DNA evidence ruled both men out as the perpetrators. In 2014, their convictions were vacated.

370. **1993: Shawn Williams**: On June 9, 1993, Marvin Mason was shot and killed in his apartment in Brooklyn, New York. As with Brian's case, NYPD officers ignored exculpatory evidence and manufactured false evidence using unduly suggestive identification procedures: NYPD officers, including Detective Scarcella, presented Margaret Smith (Mason's neighbor) with a book of photographs, moved quickly through that book, stopped on a page, and pointed to a photograph of Shawn Williams. When Smith told the officers she did not recognize Williams, the officers told Smith that he was the killer and pressured her to identify Williams. Only then did Smith identify Williams's in the photo book, in a subsequent lineup, and at trial. The KCDAO secured Smith's presence at Williams's trial through the use of a material witness order and by holding her involuntarily in police custody. Neither fact was disclosed by the KCDAO to

Williams. As with Brian, the NYPD officers disregarded eyewitness descriptions of the perpetrators that did not match Williams. Williams was convicted in 1994. Williams subsequently learned of Detective Scarcella's extensive misconduct and uncovered new evidence that was unavailable at trial. Based on this evidence, Williams's conviction was vacated in 2018. Williams subsequently filed and a federal civil rights lawsuit against the City, which was settled.

371. **1992: Emmanuelle Cooper**: On the evening of November 25, 1992, two men pushed their way into a subway token booth to rob it and also shot one of the clerks in the chest. As with Brian's case, the NYPD refused to investigate evidence pointing to another suspect and pursued Emmanuelle Cooper for the crime. Eyewitnesses Thomas Volino recognized the shooter as someone he knew from the neighborhood (not Cooper); David Lucas recognized the shooter as a local drug dealer named "Chris"; and others provided descriptions that differed from Cooper. The NYPD also received a call from an informant and an anonymous call providing an address for the shooter, as well as a tip that "Alex" had driven the getaway car and provided the actual license plate of the getaway car. Instead of investigating these leads, however, as with Brian's case, the NYPD manufactured evidence against Cooper, a young man who lived in a nearby housing project, after a man arrested for attempted murder (Rico Sanchez) agreed to point the finger at Cooper in exchange for the charges against him "going away." Sanchez had initially repeatedly denied Cooper's involvement in the crime, but he was under the influence of crack when he was interrogated, and the police succeeded in eventually coercing him into inculpating Cooper. As with Fermin in Brian's case, the police report omitted that Sanchez had been under arrest for attempted murder at the time, that he was high, or that he was coerced in anyway—instead only stating that Sanchez had identified Cooper in a photo array. Sanchez later attempted to recant but was coerced by the NYPD and KCDAO into testifying consistently with his earlier

false statements. Notably, neither Volino nor Lucas identified Cooper as the shooter; they affirmatively identified someone else. But the NYPD prepared a false police report that Volino *had* positively identified Cooper. Indeed, every witness failed to identify Cooper's photo, and only one witness identified Cooper in a lineup after police threatened the witness that they would pin the murder on him instead if he did not pick out Cooper (whose picture the NYPD had already shown him). None of this critical exculpatory evidence was turned over to the defense. In fact, the KCDAO submitted an affirmation to the trial court that there was no *Brady* evidence known to the prosecutor, and no witness had been promised anything in exchange for their testimony. Cooper was convicted and sentenced to 25 years to life imprisonment. Cooper eventually discovered the NYPD's and KCDAO's misconduct, and his conviction was vacated in 2020.

372. **1992: Everton Wagstaffe & Reginald Connor**: In 1992, 16-year-old Jennifer Negron was kidnapped from her apartment building and murdered in Brooklyn. As with Fermin in Brian's case, the NYPD fabricated statements from a regular police informant and from Negron's close friend implicating Reginald Connor and Everton Wagstaffe, a man with absolutely no connection or association with Connor before they were arrested together. Wagstaffe was at a New Years Eve party in Long Island on the night of the crime. As with Brian's case, the NYPD fed information implicating Connor and Wagstaffe to the supposed witnesses. And as with Brian's case, the NYPD also withheld exculpatory material like statements from other witnesses that did not identify Connor and Wagstaffe as the men seen in the victim's apartment building on the night of the crime. The KCDAO also failed to disclose that the prosecution's key witness was an often unreliable police informant who was also addicted to heroin and a prostitute, and that the car that was allegedly used in the crime was

double-parked and immovable at the time of the crime. Even with the fabricated evidence, the case against Wagstaffe and Connor was so thin that a judge threw out the murder charge; but Wagstaffe and Connor were convicted of second-degree kidnapping. Sixteen years later, DNA evidence conclusively established that Wagstaffe and Connor were not the perpetrators, and in 2014 a court vacated their convictions and dismissed their indictments.

373. **1994: Jabbar Collins**: On February 6, 1994, Abraham Pollack, a landlord, was shot and killed in Brooklyn during a robbery attempt at a residential apartment building. As with Brian's case, NYPD officers ignored evidence pointing to other suspects and instead chose to pursue Jabbar Collins: NYPD officers knew that the assailant and his brother were local drug dealers, but the two brothers invoked their right to counsel at an NYPD interview and could not be questioned further. The NYPD then chose to target Collins based on alleged "tip" that Collins committed the crime, even though Collins's brother and many other people could confirm that Collins was at his mother's apartment at the time of the murder. NYPD officers coerced Edwin Oliva, an individual who had been arrested for an unrelated robbery, was a heroin addict, and whom the NYPD knew was unreliable, to make a false statement claiming Collins shot Pollack. In exchange for his false statement incriminating Collins, Oliva received a lenient plea offer from the KCDAO for his pending criminal charges for robbery. Collins was indicted by a grand jury for the homicide of Pollack based on the testimony of two witnesses, both of whom identified Collins through highly suggestive photo arrays. Like in Brian's case, the grand jury was not informed of critical exculpatory evidence, including evidence implicating the two brothers and evidence that the shooter had been wounded but Collins had not been wounded. The KCDAO failed to disclose to Collins that it had offered Oliva a more lenient plea bargain for his robbery charges in exchange for Oliva's cooperation in the prosecution against Collins. Collins

was convicted in 1995 for Pollack's murder. Collins's conviction was eventually vacated in a federal habeas corpus proceeding. Collins subsequently filed a civil rights lawsuit against the City, which was settled.

374. **<u>1995: Sundhe Moses</u>**: On August 27, 1995, a four-year-old child named Shamone Johnson was killed, and three other people were wounded, when two men shot into a crowd of people in Brooklyn. As with Brian's case, NYPD officers used unduly suggestive identification procedures to target Sundhe Moses: NYPD officers pushed Sharone Ivory, a witness that did not initially recognize anyone in a photo array, to eventually select Moses from the photo array. Ivory later picked Moses from a lineup because he had previously seen Moses in the photo array and recognized him and because NYPD officers signaled to Ivory that they believed Moses to be the shooter. Moses was convicted in 1995 due to Ivory's identification and identification by another witness who the NYPD had also shown an unduly suggestive photo array. Moses eventually moved to vacate his conviction, which was granted in 2018. Moses filed a civil rights lawsuit against the City for his wrongful conviction, which was eventually settled.

375. **<u>1996: Andre Hatchett</u>**: Neda Mae Carter's body was found brutally beaten on February 18, 1991, in a Brooklyn park. She and her mother had lived in the same rooming house as Andre Hatchett's aunt, and Hatchett visited the house almost daily, including the day Carter's body was found. As with Brian's case, NYPD officers manufactured evidence implicating Hatchett using an unreliable drug addict witness facing criminal charges despite physical and other evidence that Hatchett was innocent—namely, that gunshot injuries had shattered the bones in Hatchett's leg, leaving him unable to walk without the assistance of a cane or crutches, and making it physically impossible for him to commit such a brutal attack. Nevertheless, when NYPD officers arrested an individual, Gerard Williams, for a burglary,

Williams told the arresting officer he had information about the Carter murder: specifically, that a man named James Pringle had committed it. The NYPD officers investigated the tip but learned that Pringle had been incarcerated on the night of the murder and could not have committed it. Instead of dismissing Williams as a clearly unreliable witness, NYPD officers used Williams to identify Hatchett through an unduly suggestive lineup, in part by showing Williams a mugshot of Hatchett prior to the lineup. Later, another witness named Hopkins provided a statement inculpating Williams after being fed details about the crime by the NYPD officers. Hopkins also viewed a lineup; at first, Hopkins could identify no one, but after the NYPD officers brought each person closer to the window, Hopkins identified Hatchett. The KCDAO never disclosed to Hatchett's defense counsel that Williams had first identified Pringle as the attacker. Nor did the KCDAO disclose that Williams had admitted to having smoked crack on the night he claimed to see the murder committed; and the KCDAO also did not correct Williams when he testified at trial that he did not receive a deal from the state in exchange for his testimony, even though Williams's burglary charge was dismissed. During a *Wade* hearing, an NYPD officer testified that Williams and Hopkins had identified Hatchett at a lineup but failed to disclose the NYPD's unduly suggestive techniques that tainted those lineups and led to a fabricated and false identification. Hatchett was convicted based on Williams' testimony. After investigation by the CRU revealed *Brady* violations by the KCDAO, Williams's conviction was vacated.

376. Beyond the cases involving the unlawful NYPD practices described in paragraphs 349–375, *supra*, that resulted in wrongful convictions and years of wrongful incarceration before exoneration, there are many other convictions that were reversed and/or vacated by trial and appellate courts on direct appeal or habeas (or where courts noted that misconduct occurred) that

demonstrate the pervasive nature of the NYPD's unlawful practices throughout the 1980s and 1990s such that those practices amounted to a custom or policy of the City. *See* Ex. A.

377. Beyond the cases involving the unlawful KCDAO practices described in paragraphs 349–375, *supra*, that resulted in wrongful convictions and years of wrongful incarceration before exoneration, there are many other convictions that were reversed and/or vacated by trial and appellate courts on direct appeal or habeas (or where courts noted that misconduct occurred) that demonstrate the pervasive nature of the KCDAO's unlawful practices throughout the 1980s and 1990s such that those practices amounted to a custom of policy of the City. *See* Ex. B.

378. The existence of the unlawful practices, policies and customs outlined in paragraph 309, *supra*, is documented in several governmental and nongovernmental reports examining NYPD and prosecutorial conduct in the 1980s and 1990s.

379. For example, in **2009 the New York State Bar Association's Task Force on Wrongful Convictions** (the "Task Force") released an investigative report covering 53 cases of wrongfully convicted individuals, ten of which occurred in Brooklyn (the "NYSBA Report").[4] "Wrongfully convicted individuals" were defined for purposes of the Task Force's work and the NYSBA Report as "only those individuals whose New York convictions were subsequently overturned by judicial/formal exoneration." NYSBA Report at 5.

380. The Task Force found that "government practices" by police or prosecutors contributed to more than 50% of the wrongful conviction cases studied. *Id.* at 6, 19. These

[4] N.Y. STATE BAR ASS'N, TASK FORCE ON WRONGFUL CONVICTIONS, FINAL REPORT OF THE NEW YORK STATE BAR ASSOCIATION'S TASK FORCE ON WRONGFUL CONVICTIONS 186–87 (2009), https://nysba.org/wp-content/uploads/2020/02/FinalWrongfulConvictionsReport.pdf. The Brooklyn cases are Jeffrey Blake (1991); Anthony Faison (1988); Scott Fappiano (1985); Hector Gonzalez (1996); Robert McLaughlin (1980); Charles Shepherd (1988); John Vera (1995); James Walker (1971); Collin Warner (1980); George Whitmore (1964).

practices included: (a) the use of false evidence, including false testimony about police promises, threats, and offers of benefit to a state witness; (b) the failure of the prosecutor to disclose *Brady* material; and (c) "the early prosecutorial focus, especially by the police, on a particular individual as the person who committed the crime coupled with a refusal to investigate to determine if there is a basis to believe, based on available information, that someone else may have committed the crime." *Id*. at 19.

381. The Task Force recommended that police and prosecutors be trained and supervised in the application of *Brady* and truthful evidence rules. *Id*. at 37–38. Indeed, the Task Force observed that "despite the clarity and longevity of the *Brady* rule, a sampling of recent published or otherwise available decisions show [that *Brady* violations] still occur []." *Id.* at 26 (collecting New York cases).

382. The Task Force examined several cases in which police or prosecutors first decided that a suspect was guilty and then dismissed any other indications to the contrary. *Id.* at 43.

383. In **2020, the KCDAO CRU published a report** examining twenty cases—involving 25 convicted individuals—it investigated between 2014 and 2019 where it concluded that the convictions had been wrongfully obtained (the "KCDAO CRU Report").[5] Eight cases involved crimes from the 1980s, while the remainder ranged from 1963 to 2011. KCDAO CRU Report at 6. The KCDAO CRU Report used pseudonyms to refer to the exonerated individuals in those cases. The eight cases from the 1980s consisted of:

a. **"Lucas Martinez," "Dante Velasco," and "Milo Vargas" (1980)**, which were the pseudonyms used for Raymond Mora, Amaury Villalobos, and William Vasquez discussed in paragraph 350, *supra*.

[5] KCDAO., 426 YEARS: AN EXAMINATION OF 25 WRONGFUL CONVICTIONS IN BROOKLYN, NEW YORK 6 (July 9, 2020), https://www.brooklynda.org/wp-content/uploads/2020/07/KCDA_CRUReport_v4r3-FINAL.pdf.

b. **"Alan Anderson" and "Nathan Jones" (1985)** were convicted of murder stemming from the killing of C.A. Two witnesses—J.T. and E.F.—provided statements implicating Anderson and Jones in the shooting, but their statements differed in material ways from each other and their trial testimony was inconsistent with statements they offered prior to trial. E.F. also claimed that the victim exchanged gunshots with Anderson and Jones, but there was no corroborating evidence that the victim had a gun. The KCDAO also failed to turn over J.T.'s polygraph materials, which contained statements inconsistent with his trial testimony and detectives' notes of a witness's statement suggesting an alternative shooter. CRU recommended Anderson's and Jones's convictions be vacated given inconsistent testimony offered at trial and the non-disclosure of materials important to the defense's ability to cross-examine witnesses. Jones served 20 years in prison, while Anderson died in prison after 12 years.

c. **"Scott Moore" and "Tony Stevens" (1985)**, which were the pseudonyms used for William Stuckey and David McCallum discussed in paragraphs 323 to 339, *supra*.

d. **"Nicholas Warren" (1986)** was convicted of burglary on the sole basis of testimony of P.K., who claimed to see him stealing a television from her living room in the middle of the night and knew him as a security guard working in her apartment building. Warren presented alibi witnesses that confirmed he was home, asleep, during the night of the purported burglary. When CRU later interviewed P.K. in 2015, she admitted fabricating the accusations against Warren because she believed he had stolen her car. Warren had served 1.5 years in prison on the burglary conviction, the minimum term of his sentence.

e. **"Brian Davidson" (1987)** was convicted of the robbery and rape of workers closing a restaurant one night. The workers provided varying statements of how many individuals were present during the robbery. One worker identified Davidson in a lineup only after being shown his photo in a photo array two days earlier, when she could not identify him. The other worker did not identify Davidson as one of the perpetrators he saw. Davidson was convicted despite these identification issues and discrepancies in the victims' statements. After an investigation, CRU recommended vacating Davidson's conviction due to these issues, prosecutorial misconduct, and the admission of two other individuals as having committed the crimes. David spent 30 years in prison.

f. **"Ethan Hart" (1987)**, which was the pseudonym used for Robert Hill discussed in paragraphs 340 to 348, *supra*.

g. **"Sonny Dawson" (1988)**, which was the pseudonym used for Carlos Davis discussed in paragraph 361, *supra*.

h. **"Nathan Fitzgerald" (1989)**, which was the pseudonym used for Jonathan Fleming discussed in paragraph 365, *supra*.

384. The KCDAO CRU Report identified several issues common to many of the wrongful convictions examined in the report. For example, many wrongful convictions involved significant witness credibility issues. In investigating these cases, the CRU identified inconsistencies across different witnesses' accounts, inconsistencies between a witness's account and other evidence, and physical or logical implausibilities. KCDAO CRU Report at 13. In addition to these content problems, the CRU cited witness-specific factors that impacted the credibility of the testimony, including personal grudges or interests, a reputation for erratic behavior or lying, or coming forward long after the incident or under suspicious circumstances. *Id.* These witness credibility issues were present in the following (pseudonymous) cases investigated by the NYPD and prosecuted by the KCDAO: Lucas Martinez, Dante Velasco, and Milo Vargas (1980); Alan Anderson and Nathan Jones (1985); Nicholas Warren (1986); Sonny Dawson (1988); Ethan Hart (1988); Robert Hicks (1991); Patrick Oakley (1992); Nelson Lewis (1997). *Id.* at 7–8, 48.

385. The KCDAO CRU Report also found that several wrongful convictions involved situations where the KCDAO did not disclose favorable—and in some cases, highly exculpatory—evidence to the defense. *Id.* at 14. The undisclosed information across the cases fell into four main categories: (1) prior statements of the prosecution's testifying witnesses, (2) statements from non-testifying witnesses, (3) information about the prosecution's witnesses' prior criminal history, and (4) documentary evidence that supported a claim of innocence. *Id.* These *Brady* issues were present in the following (pseudonymous) cases investigated by the NYPD and prosecuted by the KCDAO: Alan Anderson and Nathan Jones (1985); Nathan

Fitzgerald (1989); Robert Hicks (1991); Kevin Harrison (1991); Zander Wright (1995); Nelson Lewis (1997). *Id.* at 7–8, 51.

386. The KCDAO CRU Report also found that almost a quarter of the wrongful convictions it examined involved NYPD misconduct, including the creation of false or unreliable evidence; the failure to detect and adequately investigate evidence that had significant credibility problems; the failure to disclose evidence; and improper handling of physical evidence. *Id.* at 56–58. These police misconduct issues were present in the following (pseudonymous) cases investigated by the NYPD and prosecuted by the KCDAO: Lucas Martinez, Dante Velasco, and Milo Vargas (1980); Alan Anderson and Nathan Jones (1985); Scott Moore and Tony Stevens (1985); Brian Davidson (1987); Ethan Hart (1988); Carly Green (1991); Robert Hicks (1991); Kevin Harrison (1991); Julian Yeats and Curtis Watson (1992); Nelson Lewis (1997). *Id.* at 7–8, 56.

### D. The NYPD Failed to Train, Supervise, Investigate, or Discipline Its Officers on Proper Identification Procedures, Witness Interrogations, and *Brady* Obligations

387. Prior to Brian's 1989 conviction, the City was on notice of the NYPD's unlawful practices because numerous courts issued orders reversing and vacating convictions obtained before 1989 because of NYPD misconduct. *See* Ex. A. In addition, the sheer frequency and pervasiveness of the misconduct put the City on notice of the unlawful policies, practices, and customs of the NYPD outlined in paragraph 309, *supra*.

388. The pervasiveness of this unlawful conduct and the repeated and numerous court decisions outlined in Exhibit A put the City and the NYPD on notice of the inadequacy of its training, supervision, and discipline policies.

389. Additional reports made clear to the City and the NYPD that police officers joining the force were disproportionately involved in the same kind of misconduct and abuse as Brian's case.

390. Despite being on notice of the pattern of unlawful NYPD misconduct alleged above and the foreseeability of future misconduct of that kind, and the near certainty that NYPD officers would face situations like this, the NYPD did not adequately train, supervise, investigate, or discipline its officers on the misconduct described in paragraph 309 above and failed to implement any new trainings.

391. Several reports by governmental and advisory bodies not only document the existence of unlawful NYPD practices, policies, and customs, but also document the failure of the City and the NYPD to provide adequate training, supervision, discipline, and monitoring in the 1980s and 1990s and their deliberate indifference to the resulting violation of Brian's and other individual's constitutional rights.

392. **Mayor's Advisory Committee on Police Management and Personnel Policy Final Report in 1987:** On February 24, 1987, the Mayor's Advisory Committee on Police Management and Personnel Policy issued a three-volume final report (the "Committee Report").

393. Mayor Edward Koch appointed the committee in May 1985 at the police commissioner's request to review the NYPD's policies and procedures regarding recruitment, screening, evaluation, and promotion of police personnel, as well as to assess the NYPD's supervisory structure and its training of officers. Committee Report Vol. I at i. The committee accordingly examined the NYPD's policies and canvased best practices of other police departments across the nation. *Id.* at 6.

394. The committee's appointment was precipitated by several high-profile instances of police brutality in the early 1980s, which led to public concerns that the NYPD was not doing enough to screen out recruits unfit to be police officers or individuals incapable of dealing with the stress of police work. *Id.* at i.

395. The Committee Report concluded that the NYPD's mechanisms for the recruitment and training of qualified police officers were woefully deficient. It concluded that the NYPD had not assigned adequate resources to recruitment. *Id.* at 9. Moreover, the NYPD was using written examinations to determine promotion that failed to test the knowledge and skills necessary for effective job performance—but did disproportionately prevent the promotion of racial minority and female candidates. *Id.* at 12, 14, 31, 42–43, 46.

396. There was no precise way to measure the incidence of police misconduct (in part because of inadequate and inconsistent record keeping). *Id.* at 53–55; *id.* Vol. 2 at 20–21. But the Committee Report noted that, whatever the actual rate, "greater measures must be taken to prevent it, detect it[,] and dispose of it" through continuous personnel screening, rigorous performance evaluation, better supervision structures, a legitimate process for review of citizen complaints, and improved officer training. *Id.* Vol. 1 at 16–17. This was particularly true given the overall upward trend in in the number of corruption complaints through the 1980s. *Id.* Vol. 2 at 172–74.

397. The Committee Report also noted that the NYPD was one of the youngest and least experienced police forces in the nation, which resulted in disproportionate numbers of instances of misconduct. *Id.* Vol. 1 at 64. Particularly problematic was that the NYPD police academy's training of new recruits insufficiently taught officers-to-be how to provide courtroom testimony, their post-arrest responsibilities, and other practical training areas. *Id.* at 22, 74. These

failures were further compounded by the NYPD's lack of effective field training programs for probationary officers, which ought to have served as continued training and/or a screening process. *Id.* at 24, 60, 64–66, 78.

398. As a result, unqualified, unfit, and untrained candidates were permitted to enter the police force and rise through its ranks. *See id.* at 58–60.

399. Ultimately, the Committee Report produced 6 conclusions, all of which were damning:

a. The civil service system was inadequate for the selection and portion of highly qualified police officers;

b. Drug-related misconduct by police officers was on the rise and suggested "the emergency of serious new corruption hazards" in the police department;

c. Management controls within the NYPD were inadequate to identify and discipline officers with a "propensity towards misconduct";

d. "There is a severe supervisory crisis in the Police Department" caused by "long-term vacancies for the position of sergeant, the inexperience of many new supervisors, the absence of an effective system of performance evaluation, inadequate training and the distinct supervisory needs of a young police force";

e. The Civilian Complaint Review Board lacked public confidence as a fair, objective, and effective mechanism for complaints; and

f. The NYPD "lack[ed] an effective program of field, in-service and promotional training" for new officers or supervisory and executive leadership, and the NYPD facilities were "inadequate for providing the kind of professional training needed for a modern law enforcement agency."

400. **Mollen Commission Report in 1994:** On July 7, 1994, the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department (the "Mollen Commission") issued a report (widely referred to as the "Mollen Report") that addressed corruption in the NYPD. The Mollen Report investigated the 1980s and 1990s through the date of the report's publishing.

401. Importantly, the Mollen Report described the state of corruption in the present tense and stated that the Commission's "findings raise significant concerns about . . . the potential for these problems to grow without sustained vigilance and oversight." Mollen Report at 1.

402. The Commission found, based on its interviews with numerous former and current police officers and supervisors, prosecutors, defense attorneys and civilians arrested for various offenses, a review of hundreds of arrest records, and its own field investigations of narcotics enforcement units, that "[p]olice perjury and falsification of official records is a serious problem facing the Department" that "taints arrests on the streets." *Id.* at 36. This was "probably the most common form of police corruption facing the criminal justice system," and was "so common in certain precincts that it has spawned its own word: 'testilying.'" *Id.*

403. The Mollen Report observed "a deeprooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world. Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justified, even if unlawful," *id.* at 41.

404. The Mollen Report concluded that "[o]fficers and their immediate supervisors are not the only culprits in tolerating falsifications . . .. [T]he Department's top commanders must share the blame." *Id.* at 41.

405. The NYPD avoided addressing the serious corruption within its ranks, manifesting "in every component of the Department's corruption controls from command accountability and supervision, to investigations, police culture, training and recruitment." *Id.* at 2–3.

406. Far from training officers and detectives on how to avoid corruption, supervisors and commanding officers were "complacent" about maintaining integrity; some went so far as to instruct line officers to "keep your mouth shut" if they got caught. *Id.* at 3. Line officers from various commands in the NYPD told the Commission that the messages they received from their supervisors meant that "they would never report even serious corruption" because they feared the consequences of being labeled a "rat" and lacked confidence in the NYPD's ability to maintain confidentiality. *Id.* at 4.

407. The Mollen Commission found that "supervisory failures are a major contributing factor to corruption." *Id.* at 80. There was a "widespread breakdown in supervision which fueled and protected the corruption we observed." *Id.* at 80. Supervisors turned a "blind eye to corruption which they knew or strongly suspected existed" and "many supervisors did not believe that uprooting corruption was part of their responsibilities." *Id.* In addition, supervisors "abandoned their responsibility to evaluate officers in their command and to flag "problem" officers for the Department," including by using boilerplate performance evaluations. *Id.* at 81.

408. The NYPD did not investigate police lying and corruption. At the time of the Mollen Report, the Commission was unaware of a "single, self-initiated Internal Affairs Division investigation into patterns of police perjury and falsification." *Id.* at 41. IAD could not properly track perjury and falsification of records because it had no specific category to capture that kind of misconduct; predictably, IAD had no record of the number of falsification allegations brought against NYPD officers as a whole or within a particular precinct or command in the prior decade. *Id.*

409. Indeed, the top commanders and head of its anti-corruption controls revealed the NYPD's view that they avoided fighting police corruption in order to forestall bad press. *Id.* at 4.

The Mollen Report noted that "the basic equipment and resources needed to investigate corruption successfully were routinely denied to corruption investigators; internal investigations were prematurely closed and fragmented and targeted petty misconduct more than serious corruption; intelligence-gathering was minimal; integrating training was antiquated and often non-existent; Internal Affairs undercover officers were often placed in precincts where corruption was least prevalent; reliable information from field associates was ignored; supervisors and commanders were not held accountable for corruption in their commands; and corruption investigators often lacked investigative experience and almost half had never taken the Department's 'mandatory' basic investigative training course." *Id.* at 3.

410. The Commission noted that it was "not aware of a single instance in which a supervisor or commander has been sanctioned for permitting perjury or falsification on their watch," *id.* at 41, and found that "[t]here is no evidence that anyone in the Department's chain of command had focused on eliminating this practice, including past Police Commissioners and Internal Affairs chiefs, who apparently turned a blind eye to unlawful practices that were purportedly committed to fight crime and increase arrest statistics," *id.* at 41–42. Given this situation, the Mollen Report determined that "successful enforcement of command accountability requires a complete reinvention of the systems for enforcing it." *Id*. at 79.

411. This Court has already found that the Mollen Report "provides powerful evidence that there was a custom and practice within the police department of tolerating corruption to avoid bad publicity" and "characterizes this custom as persistent, widespread, and emanating 'from top commanders, including the police commissioner.'" *Pipitone v. City of New York*, 57 F. Supp. 3d 173, 191 (E.D.N.Y. 2014). "The Mollen Report thus provides evidence that is sufficient

to allow a jury to conclude that the supervisory and disciplinary failures described therein constituted a municipal policy for *Monell* purposes[.]" *Id.* at 191.

412. Prior to July 1993, the CCRB, which is responsible for receiving and investigating complaints of police misconduct made by citizens against members of the NYPD, operated as an agency of the NYPD rather than as an independent, unbiased entity.

413. During the 1980s and early 1990s, in and about the time frame of Brian's prosecution and conviction, the CCRB received numerous complaints of police misconduct, but failed to fully investigate many of them and substantiated the guilt of the accused police officer in a suspiciously minuscule number of cases.

414. On average, from 1985 to 1988, the CCRB conducted complete investigations of only 27 percent of the complaints received, closed 45 percent of the total cases without completing full investigations, and substantiated (i.e., found the subject employee guilty of the alleged act of misconduct) only 1.9 percent of the total complaints received.

415. In 1989, the CCRB conducted complete investigations of only 29 percent of the 3,515 complaints received, closed 41 percent of the total cases without completing full investigations, and substantiated only 2.6 percent of the total complaints received.

416. On average, from 1990 to 1992, the CCRB conducted complete investigations of only 36 percent of the complaints received, closed 40 percent of the total cases without completing full investigations, and substantiated only 3.3 percent of the total complaints received.

417. The CCRB has also failed to recommend disciplinary action in the vast majority of its cases.

418. On average, from 1985 to 1988, the CCRB recommended disciplinary action in only 6.7 percent of its disposed of cases.

419. In 1989, the CCRB recommended specific disciplinary action to the Police Commissioner in only 3.4 percent of its disposed of cases (i.e., 110 recommendations of discipline out of the 3262 disposed of complaints).

420. On average, in 1990–1992, the CCRB recommended disciplinary action in only 7.5 percent of its disposed of cases.

421. Moreover, most of the complaints that are substantiated by the CCRB do not result in any kind of meaningful discipline. For instance, as of November 14, 1991, of the 81 officers who faced departmental trials in 1991, 47 were cleared, and 34 were disciplined with penalties ranging from loss of vacation to a 90-day suspension.

422. **The 2002 New York City Bar Report:** In 2002, the New York City Bar issued a report noting that the "City paid a total of $140 million in damages for alleged police abuses, through settlements as well as litigated judgments, between the 1994–95 and 1998–99 fiscal years. By contrast, in the five years 1988–92, the City paid out $45.5 million for similar cases. Despite the substantial sums involved, there is no showing that either the police department or the City administration has made systematic use of the facts or results in such cases either in connection with the discipline of individual police officers or in the shaping of police department policy."[6]

423. Despite its knowledge of these unlawful practices, Defendant City and the NYPD—by their policy-making agents, servants, and employees—authorized, sanctioned, and/or

---

[6] N.Y.C. BAR ASS'N, THE FAILURE OF CIVIL DAMAGES CLAIMS TO MODIFY POLICE PRACTICES AND RECOMMENDATIONS FOR CHANGE 2 (2002), https://www.nycbar.org/reports/the-failure-of-civil-damages-claims-to-modify-police-practices-and-recommendations-for-change/.

ratified the wrongful acts; and/or failed to take any steps to prevent or stop continued violations; and/or allowed or encouraged these acts to continue, which led to the Individual Defendants and ADA Bjorneby engaging in those unlawful practices during their investigation, arrest, and prosecution of Brian Kendall.

424. In response to the court decisions outlined in Exhibit A, the cases described above, and need for reforms documented in governmental and nongovernmental reports published in the 1990s, the NYPD failed to change any NYPD policy, practice, or procedure and failed to discipline any officer.

425. Until at least 1996, the NYPD did not provide any training concerning the appropriate interrogation of informant witnesses and *Brady* compliance. Many present and former police detectives, including supervisors, testified during depositions in civil rights lawsuits that they had no idea what *Brady* was and no clue about their obligation to comply with it. *See, e.g.*, *Zahrey v. City of New York*, No. 98 Civ. 4546 (DLC) (S.D.N.Y.).

### E. The KCDAO Failed to Train, Investigate, Discipline, or Supervise Its Prosecutors Despite Notice and Knowledge of Widespread Misconduct and Constitutional Violations

426. The existence of such unlawful de facto policies and/or well-settled and widespread customs and practices, described in paragraph 309, *supra*, has been known to supervisory and policy-making officers and officials of the KCDAO and the City for a substantial period of time.

427. The City was on notice prior to Brian's 1989 conviction of the KCDAO's unlawful practices because numerous courts issued orders reversing and vacating convictions obtained before 1989 because of KCDAO misconduct. *See* Ex. B. In addition, the sheer frequency and pervasiveness of the misconduct put the City on notice of the unlawful policies,

practices, and customs of the KCDAO outlined in paragraph 309, *supra*. Therefore, it was foreseeable to the KCDAO and the City that prosecutors would withhold *Brady* material from criminal defendants.

428. Despite its knowledge of these unlawful practices, Defendant City and the KCDAO—by their policy-making agents, servants, and employees—authorized, sanctioned, and/or ratified the wrongful acts; and/or failed to take any steps to prevent or stop continued violations; and/or allowed or encouraged these acts to continue, which led to the Individual Defendants and ADA Bjorneby engaging in those unlawful practices during their investigation, arrest, and prosecution of Brian.

429. Despite being on notice of the *Brady* violations and the foreseeability of future *Brady* violations and the near certainty that prosecutors would possess material subject to *Brady* obligations, the KCDAO did not adequately train its prosecutors on their *Brady* obligations and failed to implement any new trainings.

430. Under the principles of municipal liability for federal civil rights violations, the District Attorney of Kings County (or her authorized delegates) has final authority and is the City's policymaker in the training, instructing, supervising, and disciplining of attorneys.

431. The then-District Attorney of Kings County, Elizabeth Holtzman, personally and/or through her authorized delegates, at all relevant times had final authority, and constituted a City policymaker for whom the City is liable, with respect to such conduct.

432. On information and belief, DA Elizabeth Holtzman had no formal policies or trainings requiring disclosure of *Brady* information or any written policy on how to disclose it. That state of affairs continued into the administration of District Attorney Charles Hynes, who assumed that office in 1990.

433. On information and belief, DA Holtzman's office provided no training on how to question or evaluate informant or accomplice witnesses.

434. On information and belief, prosecutors and investigators were trained on avoiding the creation of *Brady*, *Giglio*, and *Rosario* material, instructed not to disclose *Brady* information if they could rationalize nondisclosure by subjectively assessing the information as "unreliable" or "incredible," and encouraged to cover up *Brady* information kept hidden by other members of the KCDAO.

435. The post-conviction litigation of *Collins v. City of New York*, No. 11 Civ. 766 (FB) (RML) (E.D.N.Y.), revealed that at the time of Brian's arrest and conviction, the KCDAO had no procedure in place to discipline prosecutors for violating their *Brady* obligations. It further revealed that the KCDAO was deliberately indifferent to or endorsed *Brady* violations generally.

436. Hynes first became District Attorney on January 1, 1990. In the *Collins* case, DA Hynes and others admitted that the only disciplinary procedure in place for *Brady* violations was for Hynes to personally review the appellate decision to decide if discipline was warranted. Hynes and other KCDAO executives could not identify a single instance of a prosecutor being disciplined during Hynes's entire 24-year tenure. On information and belief, this disciplinary "procedure" was a remnant from DA Holtzman's administration and continued throughout DA Hynes's administration.

437. These policies, customs, and practices have led the Second Circuit and numerous courts within this District to recognize analogous § 1983 *Monell* claims brought by other wrongfully convicted persons. *See, e.g.*, *Walker v. City of New York*, 974 F.2d 293, 300–01 (2d Cir. 1992) (reversing district court's dismissal of *Monell* claim based on deliberate indifference

of KCDAO, under former DA Hynes, to prosecutorial misconduct and violations of defendants' constitutional rights); *Bailey v. City of New York*, 79 F. Supp. 3d 424, 441–43 (E.D.N.Y. 2015) (denying City's summary judgment motion on *Monell* claim based on deliberate indifference of KCDAO, under former DA Hynes, to prosecutorial misconduct and violations of defendants' constitutional rights); *Collins v. City of New York*, 923 F. Supp. 2d 462, 477 (E.D.N.Y. 2013) (denying City's motion to dismiss *Monell* claim based on deliberate indifference of KCDAO, under former DA Hynes, to prosecutorial misconduct and violations of defendants' constitutional rights).

438. On information and belief, prosecutors were permitted and encouraged not to comply with the KCDAO's ongoing *Brady* obligations after trial; to resist criminal defendants' efforts to obtain disclosure on appeal, during collateral attacks on convictions, and through Freedom of Information Law requests; and even to lie or mislead courts in affidavits and testimony, all with the aim of covering up wrongdoing within the KCDAO and defeating defendants' efforts to expose misconduct and overturn wrongful convictions.

439. On information and belief, prosecutors, in violation of *Brady*, were permitted or encouraged to refrain from disclosing pressure tactics, promises, and rewards used to influence witnesses.

440. Through a policy, custom, and practice of not disciplining prosecutors or investigators for *Brady* or other constitutional violations and taking no remedial action in cases where such wrongdoing was discovered (through court decisions, post-conviction proceedings, or otherwise), on information and belief, former DA Holtzman encouraged such violations by demonstrating to her prosecutors and investigators that there would be no negative consequences for their failure to comply with *Brady* and other constitutional requirements.

441. On information and belief, former DA Holtzman had no employee handbook, manual, or other document setting forth any disciplinary process or potential penalties for *Brady* or other constitutional violations by prosecutors or investigators. In fact, there was no such process or penalties.

442. Despite dozens of court decisions finding that prosecutors had wrongfully withheld information, in violation of *Brady*, *Rosario*, or state discovery laws, or otherwise had engaged in conduct that misled courts, juries, defendants, and defense attorneys, on information and belief, none of the prosecutors involved were disciplined.

## FIRST CAUSE OF ACTION

**Malicious Prosecution**
**(42 U.S.C. § 1983, Fourth, Fifth, and Fourteenth Amendments of the U.S. Constitution)**
**Against Individual Defendants**

443. Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

444. 42 U.S.C. § 1983 prohibits any person acting under color of state law, custom, or usage to deprive a citizen of rights secured by the U.S. Constitution.

445. At all relevant times, the Individual Defendants acted under color of state law.

446. The Individual Defendants, acting in concert and aiding and abetting one another, intentionally, knowingly, and willfully manufactured, or caused the manufacturing of false statements and identifications by Fermin and Jones, which they improperly compelled or induced those individuals to adopt, implicating Brian Kendall in the murder of Raphael Reyes, and causing the KCDAO to commence and/or continue criminal charges against Plaintiff.

447. The Individual Defendants knew that the statements and identifications would be relied upon by the KCDAO and the court as a basis to authorize Plaintiff's arrest, actually arrest him, and to formally initiate his prosecution, and that the statements and identifications would be

introduced into evidence at Plaintiff's trial. Those statements and identifications were forwarded to the KCDAO, which in turn did in fact introduce them during grand jury proceedings and pretrial hearings.

448. By virtue of the foregoing, the Individual Defendants are liable to Plaintiff for damages, pursuant to 42 U.S.C. § 1983, for knowingly, willfully, and maliciously causing Plaintiff to be seized, prosecuted, and deprived of his liberty without probable cause, in violation of his right to be free of unreasonable search and seizure pursuant to the Fourth and Fourteenth Amendments to the United States Constitution, and to procedural due process pursuant to the Fifth and Fourteenth Amendments.

449. The Individual Defendants are also liable to Plaintiff under 42 U.S.C. § 1983 for knowingly, willfully, and maliciously depriving Plaintiff of his liberty, without probable cause, through outrageous conduct that shocks the conscience, in violation of Plaintiff's right to substantive due process pursuant to the Fifth and Fourteenth Amendments to the United States Constitution.

450. Those proceedings were ultimately terminated in Plaintiff's favor, in a manner affirmatively indicating his innocence.

451. As a direct and proximate result of the unlawful conduct of the Individual Defendants, Plaintiff has sustained damages.

## SECOND CAUSE OF ACTION

**Malicious Prosecution**
**(Common Law of the State of New York)**
**Against all Defendants**

452. Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

453. The Individual Defendants, acting in concert and aiding and abetting one another, intentionally, knowingly and willfully manufactured, or caused the manufacturing of false statements and identifications by Fermin and Jones, which they improperly compelled or induced those individuals to adopt, implicating Brian Kendall in the murder of Raphael Reyes, and causing the KCDAO to commence and/or continue criminal charges against Plaintiff.

454. The Individual Defendants knew that the statements and identifications would be relied upon by the KCDAO and the court as a basis to authorize Plaintiff's arrest, actually arrest him, and to formally initiate his prosecution, and that the statements and identifications would be introduced into evidence at Plaintiff's trial. Those statements and identifications were forwarded to the KCDAO, which in turn did in fact introduce them during grand jury proceedings and pretrial hearings.

455. By virtue of the foregoing, the Individual Defendants acted in concert with each other and with additional persons for whose acts they are liable, initiated, continued, and/or caused the initiation or continuation of, criminal proceedings against Plaintiff.

456. Defendant City is liable under the principle of *respondeat superior*.

457. The criminal proceedings terminated in favor of Plaintiff.

458. There was no probable cause for the commencement or the continuation of the criminal proceedings.

459. Defendants acted with actual malice.

460. As a direct and proximate result of Defendants' unconstitutional conduct, Plaintiff has sustained the damages herein alleged.

## THIRD CAUSE OF ACTION

**Suppression of *Brady v. Maryland* Material; Denial of Due Process and Fair Trial (42 U.S.C. § 1983, Fifth, Sixth, and Fourteenth Amendments of the U.S. Constitution) Against Individual Defendants**

461. Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

462. The Individual Defendants and the KCDAO, pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and the due process and fair trial provisions of the Fifth, Sixth, and Fourteenth Amendments, had an absolute constitutional obligation to disclose to the prosecution, and to the defense, all evidence and information in their possession or knowledge which tended to favor Plaintiff, including exculpatory and impeaching information, including but not limited to, (1) the names of all witnesses from whom the Individual Defendants had taken statements and/or interviewed that exculpated Plaintiff and/or indicated that a third party other than Plaintiff was responsible for the murder of Reyes, (2) the DD5 documenting the Individual Defendants' interview with Patrick Sonen, (3) the statement of Officer Platt to the Individual Defendants and/or ADA Bjorneby exculpating Plaintiff, (4) the recordings of the 911 calls and radio runs from the responding NYPD officers to Central Dispatch immediately after the shooting, (5) the open criminal charges Fermin faced when he had provided his statement and identification of Plaintiff, (6) the plea agreement that Fermin had entered into in exchange for his testimony against Plaintiff, (7) the letter ADA Bjorneby sent to support Fermin's early release from incarceration, (8) the letter received by the NYPD and KCDAO from Ruiz providing his location, and (9) their own and each other's misconduct in fabricating evidence against Plaintiff and lying before the grand jury and at the *Wade* hearing.

463. On July 10, 1989, the case was sent to Part 10 to begin trial immediately following a *Wade* hearing on July 19, 1989.

464. On July 19, 1989, Plaintiff pled guilty to the murder of Reyes.

465. Any *Brady* evidence therefore should have been produced by *at least* July 19, 1989, before Plaintiff pled guilty, but it was not.

466. The Individual Defendants knowingly, willfully, intentionally, and/or recklessly, failed to disclose such evidence and information.

467. The suppressed evidence was material, likely to influence a jury's decision, and there is a reasonable probability that had the evidence been disclosed to the defense, Plaintiff would not have pled guilty and the KCDAO would not have been able to prove Plaintiff's guilt beyond a reasonable doubt.

468. The Individual Defendants thereby violated Plaintiff's right to procedural and substantive due process and to a fair trial pursuant to the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and are liable to Plaintiff for damages under 42 U.S.C. § 1983.

469. As a direct and proximate result of the unlawful conduct of the Individual Defendants, Plaintiff has sustained the damages herein alleged.

## FOURTH CAUSE OF ACTION

**Manufacturing of False Evidence; Denial of Due Process and a Fair Trial (42 U.S.C. § 1983, Fifth, Sixth, and Fourteenth Amendments of the U.S. Constitution) Against Individual Defendants**

470. Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

471. The Individual Defendants, acting individually and in concert, knowingly and intentionally manufactured, or caused the manufacturing of, false evidence that they knew would and intended to be used against Plaintiff at his trial, namely (a) the statements of Fermin and Jones that implicated Plaintiff in the murder of Reyes, (b) the identifications by Fermin and

Jones of Plaintiff through the use of unduly suggestive photo arrays and lineup, (c) not documenting statements by Officer Platt and others witnesses that exculpated Plaintiff and/or indicated that a third party other than Plaintiff was responsible for the murder of Reyes, and (d) lying before the grand jury and at the *Wade* hearing.

472. The Individual Defendants knew and intended that the false evidence would deprive Plaintiff of a fair trial and result in his wrongful conviction and incarceration.

473. This fabricated evidence was provided to the KCDAO, served as the KCDAO's decision to charge Plaintiff with Reyes's murder, and would have been likely to influence a jury's decision were the evidence to be presented at trial.

474. The fabricated evidence was presented as evidence against Plaintiff and was a basis for Plaintiff's decision to plead guilty.

475. The Individual Defendants thereby violated Plaintiff's right to procedural and substantive due process and to a fair trial pursuant to the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and are liable to Plaintiff for damages under 42 U.S.C. § 1983.

476. As a direct and proximate result of the unlawful conduct of the Individual Defendants, Plaintiff has sustained the damages herein alleged.

**FIFTH CAUSE OF ACTION**

***Monell* Liability**
**(42 U.S.C. § 1983)**
**Against Defendant City**

477. Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

478. The foregoing violations of Plaintiff's federal constitutional rights and injuries were further directly, foreseeably, proximately, and substantially caused by conduct, chargeable

to the City, amounting to deliberate indifference to the constitutional rights of persons, including Plaintiff who are investigated, arrested, or prosecuted for alleged criminal activities.

479. At the time of Plaintiff's wrongful prosecution, Elizabeth Holzman was the Kings County District Attorney, an elected officer of Kings County, one of the constituent counties of the City, and the office was and is funded out of the City's budget.

480. DA Holtzman, as the District Attorney, was designated a "local officer," rather than a "state officer," under the New York Public Officers Law and federal *Monell* jurisprudence, *Bellamy v. City of New York*, 914 F.3d 727 (2d Cir. 2019); and New York has provided by statute (NY County Law §§ 53, 941) that the City's constituent counties (including Kings County), and hence the City itself, shall have liability for torts committed by County officers and employees, such as the District Attorney and her assistants.

481. Under the principles of municipal liability for federal civil rights violations, the City's Police Commissioner (or his authorized delegates) and the Kings County District Attorney (or her authorized delegates) had final responsibility for training, instructing, supervising, and disciplining police and prosecutorial personnel with respect to the investigation and prosecution of criminal matters, including constitutional requirements governing the initiation of criminal prosecutions, the use of only truthful evidence, and the disclosure of *Brady* material.

482. The Police Commissioner, personally and/or through his or her authorized delegates, at all relevant times had final authority and constituted a City policymaker for whom the City is liable, with respect to compliance by NYPD employees with the above-mentioned constitutional requirements.

483. Likewise, the Kings County District Attorney, personally and/or through her authorized delegates, at all relevant times had final authority and constituted a City policymaker

for whom the City is liable, with respect to compliance by District Attorney employees with the above-mentioned constitutional requirements.

484. During all times relevant to this Complaint, the City, through its policymaking officials at the NYPD and KCDAO, was deliberately indifferent, to the constitutional rights of individuals suspected or accused of criminal activity, to the risk of arresting, prosecuting and convicting innocent people, and to the rights of all criminal suspects and defendants to due process and a fair trial, by implementing plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and discipline concerning:

a. NYPD officers "testilying" or fabricating false evidence, including witness statements, to support the police officers' preconceived perceptions or determinations of guilt, and then relying on such false evidence to claim probable cause to arrest suspects on criminal charges;

b. NYPD officers using unduly suggestive identification procedures to obtain false positive witness identifications of supposed suspects and then relying upon those false identifications to claim probable cause to arrest suspects on criminal charges;

c. NYPD officers knowingly offering false testimony, either from themselves or from witnesses, before a grand jury to secure an indictment;

d. NYPD officers failing to obtain, preserve, and timely disclose, during criminal investigations and prosecutions, all material evidence or information favorable to a person suspected, accused, or convicted of criminal conduct, including exculpatory evidence as well as evidence impeaching or undermining prosecution witnesses;

e. NYPD's failure to adequately instruct, train, supervise, and discipline employees with respect to such matters;

f. KCDAO prosecutors using false, misleading, or unreliable evidence, testimony, statements, or argument during criminal proceedings, including bail hearings, pretrial hearings, trials, and post-conviction proceedings;

g. KCDAO prosecutors failing to correct false, inaccurate, incomplete, or misleading evidence, testimony, statements, and argument, whenever such misconduct was discovered to have occurred;

h. KCDAO prosecutors failing to obtain, preserve, and timely disclose, during criminal investigations and prosecutions, all material evidence or information favorable to a person suspected, accused, or convicted of criminal conduct, including exculpatory evidence as well as evidence impeaching or undermining prosecution witnesses; and

i. KCDAO's failure to adequately instruct, train, supervise, and discipline employees with respect to such matters.

485. The aforesaid deliberate or *de facto* policies, procedures, regulations, practices and/or customs, including the failure to properly investigate, supervise, discipline, and/or rectify employees' conduct with regard thereto, were implemented or tolerated by policymaking officials for the City, including, but not limited to, the District Attorney of Kings County and her delegates and the Police Commissioner and his delegates, who knew:

a. To a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

b. That such issues present employees with difficult choices of the sort that instruction, training, supervision, and discipline will make less difficult or will incentivize correct choices;

c. That the wrong choice by municipal employees concerning such issues will frequently cause the deprivation of the constitutional rights of an accused and cause him constitutional injury; and

d. That employees of the NYPD and KCDAO had a history of making wrong choices in such matters.

486. The aforementioned policy making officials had the knowledge and notice alleged in the preceding paragraph based upon:

a. Numerous credible allegations, many substantiated by judicial decisions as demonstrated above, that NYPD officers and Kings County ADAs had:

   i. Participated in the manufacturing of false testimony or evidence, including identification evidence;

   ii. Presented or failed to correct false or misleading testimony and argument; and/or

iii. Failed to disclose at all, or on a timely basis, information favorable to the defense that was required to be disclosed by the Constitution and laws of the United States and the State of New York.

b. The inherent obviousness of the need to train, supervise, and discipline NYPD officers and ADAs in their aforementioned constitutional obligations.

487. As a direct and proximate result of Defendant City's unconstitutional conduct, Plaintiff sustained the damages herein alleged.

**SIXTH CAUSE OF ACTION**

**Negligent Hiring, Training and Supervision**
**(Common Law of the State of New York)**
**Against Defendant City**

488. Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

489. By virtue of the foregoing, Defendant City is liable to Plaintiff because of its intentional, deliberately indifferent, careless, reckless, and/or negligent failure to adequately hire, train, supervise, and discipline its agents, servants, and/or employees employed by the Kings County District Attorney's Office and/or the New York City Police Department, including but not limited to the Individual Defendants, with regard to their aforementioned duties.

490. The Individual Defendants were unfit for their positions and duties.

491. Defendant City's misconduct in this regard proximately caused Plaintiff's wrongful arrest and conviction.

492. As a direct and proximate result of Defendant City's misconduct, Plaintiff has sustained the damages herein alleged.

## SEVENTH CAUSE OF ACTION

**Civil Conspiracy**
**(Common Law of the State of New York)**
**Against All Defendants**

328. Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

329. The Individual Defendants, as part of a common scheme, expressly and/or tacitly agreed to manufacture inculpatory evidence and suppress exculpatory evidence to frame Plaintiff and maliciously prosecute him for a crime he did not commit.

330. Upon information and belief, in furtherance of their agreement, the Individual Defendants coordinated their efforts and committed overt acts, as detailed above, to accomplish the goal of their conspiracy to (a) frame Plaintiff for the crime and (b) cover up their misconduct.

331. Defendant City is liable under the principle of *respondeat superior*.

332. As a direct and proximate result of Defendants' misconduct, Plaintiff has sustained the damages herein alleged.

## EIGHTH CAUSE OF ACTION

**Civil Conspiracy**
**(42 U.S.C. § 1983)**
**Against Individual Defendants**

333. Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

334. The Individual Defendants, as part of a common scheme, expressly and/or tacitly agreed to manufacture inculpatory evidence and suppress exculpatory evidence to frame Plaintiff and maliciously prosecute him for a crime he did not commit.

335. Upon information and belief, in furtherance of their agreement, the Individual Defendants coordinated their efforts and committed overt acts, as detailed above, to accomplish the goal of their conspiracy to (a) frame Plaintiff for the crime and (b) cover up their misconduct.

336. Each of the Individual Defendants committed the foregoing violations of Plaintiff's rights knowingly, intentionally, willfully, and recklessly, or with reckless disregard and conscious indifference to the clear risk of the consequences to Plaintiff that shocks the conscience.

337. By reason of the foregoing, the Individual Defendants are liable to Plaintiff pursuant to 42 U.S.C. § 1983 for compensatory and punitive damages.

338. As a direct and proximate result of the Individual Defendants' misconduct, Plaintiff has sustained the damages herein alleged.

***

WHEREFORE, Plaintiff respectfully requests judgment against Defendants as follows:

a) Awarding such damages as will fully compensate him for his loss of rights, physical injuries, and emotional distress suffered due to Defendants' unlawful conduct;

b) Awarding punitive damages;

c) Awarding Plaintiff reasonable attorneys' fees, costs, and expenses incurred in prosecuting this action, pursuant to 42 U.S.C. § 1988 and the inherent powers of the Court;

d) Pre-judgment interest as allowed by law; and

e) Granting Plaintiff such other further relief as may be just and proper.

Dated: New York, New York
July 1, 2026

EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP

By: ___/s/_______________
Julia P. Kuan
Vasudha Talla
Hafsa S. Mansoor
1 Rockefeller Plaza, 8th Floor
New York, New York 10020
(212) 763-5000

*Attorneys for Plaintiff*